(

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

JAN 2 7 2000

Michael N. Milby, Clerk of Court

DENNIS THURL DOWTHITT,      §
     Petitioner,      §
     §
v.      §
     §
GARY L. JOHNSON, Director,      §
     Respondent.      §

CIVIL ACTION NO. H-98-3282

## <u>MEMORANDUM AND ORDER</u>

Petitioner Dennis Thurl Dowthitt was convicted and sentenced to death for the capital murder of Gracie Purnhagen committed in the course of aggravated sexual assault. Petitioner, though counsel, filed a Petition for Writ of Habeas Corpus [Doc. # 19] on December 30, 1998, and an Amended Petition ("Petition") [Doc. # 24] on February 11, 1999. The Court has jurisdiction pursuant to 28 U.S.C. § 2254.

The Amended Petition is before the Court on Respondent Gary Johnson's Motion for Summary Judgment ("Motion") [Doc. # 47] and Amended Motion for Summary Judgment ("Amended Motion") [Doc. # 50], to which Petitioner has responded in opposition ("Response") [Doc. # 52] and ("Supplemental Response") [Doc. # 55]. The Court has thoroughly reviewed the entire record in this case, including the full state court pretrial, trial, and habeas record.

The Court authorized substantial funding for Petitioner to obtain requested expert and other investigative services. The Court conducted an evidentiary hearing on the allegation that Delton Dowthitt, post-trial, recanted his trial testimony and confessed to the murder for which Petitioner was convicted. The Court also carefully considered and applied the

68

provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Based on this review of the record and the application of governing legal authorities, the Court concludes that Petitioner is not entitled to federal habeas relief.

## FACTUAL BACKGROUND

Petitioner is in the custody of the Texas Department of Criminal Justice, Institutional Division, pursuant to a judgment and sentence of death from the 221st Judicial District Court of Montgomery County, Texas, in Cause No. 91-10-01240. Petitioner was tried before a jury upon a plea of not guilty and, on October 7, 1992, was found guilty of capital murder.

At Petitioner's trial, the State presented evidence that Petitioner and his son, Delton Dowthitt ("Delton") picked up Gracie and Tiffany Purnhagen, ages 16 and 9, on June 13, 1990. The State presented evidence that Petitioner cut Gracie's throat and sodomized her with a beer bottle. While Petitioner was murdering and sexually assaulting Gracie, Delton strangled Tiffany.[1]

Following a separate punishment phase hearing, the jury answered in the affirmative both special issues submitted pursuant to Article 37.071(b) of the Texas Code of Criminal Procedure.[2] The jury then answered negatively the sentencing issue submitted pursuant to

---

[1] The evidence presented at trial will be set forth in more detail in the Court's discussion of Petitioner's specific claims for relief.

[2] Special Issue No. 1, the deliberateness question, asked "[w]hether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?" Special Issue No. 2, the future dangerousness question, asked "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

(

the Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989).[3]  In accordance

with the jury's answers and applicable state law, the trial court sentenced Petitioner to death.

The Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence

in a published opinion issued June 26, 1996.  *Dowthitt v. State*, 931 S.W.2d 244 (Tex. Crim.

App. 1996).

Petitioner filed a state application for habeas relief on August 19, 1997, and later

supplemented the state application.    The Montgomery County District Court entered

Findings of Fact and Conclusions of Law on March 6, 1998, and recommended that relief

be denied.  *See* Findings of Fact and Conclusions of Law, contained in the state court record

at 1121-1135 (cited herein as "FFCL").  The Court of Criminal Appeals reviewed the record

and, finding the trial court's findings and conclusions to be accurate and supported by the

record with some limited exceptions, denied Petitioner's request for habeas relief.  *Ex Parte*

*Dowthitt*, No. 37,557 (Tex. Crim. App. Sept. 16, 1998).  Petitioner's request for a writ of

certiorari was denied by the United States Supreme Court on April 19, 1999.  *Dowthitt v.*

*Texas*, 119 S. Ct. 1466 (1999).

After having obtained appointment of counsel on October 14, 1998 [Doc. # 10],

Petitioner filed a petition for federal habeas relief on December 30, 1998 and supplemented

---

[3]      Special Issue No. 3, to be answered only if both Special Issues No. 1 and No. 2 were
answered "yes," asked "[w]hether, taking into consideration all of the evidence, including the
circumstances of the offense, the defendant's character and background, and the personal
moral culpability of the defendant, there is a sufficient mitigating circumstance or
circumstances to warrant that a sentence of life imprisonment rather than a death sentence be
imposed."

(

the petition on February 11, 1999. The Court issued an order on January 4, 1999, staying Petitioner's scheduled execution.

## STANDARDS OF REVIEW

This federal petition for habeas relief is governed by the applicable review provisions of the AEDPA, which became effective April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997); *Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997) ("the relevant date for determining the applicability of the AEDPA to habeas corpus petitions is the date that the actual habeas corpus petition is filed"), *cert. denied*, 119 S. Ct. 144 (1998). Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

With reference to the first standard of review, applicable to legal issues and mixed issues, the "contrary to" clause applies to the state court's legal conclusions, and the "unreasonable application" clause applies to mixed questions of law and fact. *Drinkard v. Johnson*, 97 F.3d 751, 767-68 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997). The "unreasonable application" standard regarding mixed questions permits federal habeas relief only if a state court decision is "so clearly incorrect that it would not be debatable among reasonable jurists." *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997) (quoting *Drinkard*, 97 F.3d at 769), *cert. denied*, 523 U.S. 1139 (1998). "In applying this standard,

(

we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999).

The second standard of review under the AEDPA applies to factual issues and precludes federal habeas relief unless the state court's adjudication of the merits of Petitioner's claim was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *Drinkard*, 97 F.3d at 767. The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Kitchens*, 190 F.3d at 700.[4]

"If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless" certain conditions are satisfied. 28 U.S.C. § 2254(e)(2); *see also Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-12 (1992) (requiring Petitioner in pre-AEDPA habeas proceeding to show cause and actual prejudice for failure to develop facts in the state court proceeding before he can obtain an evidentiary hearing). The Fifth Circuit has held that "a petitioner cannot be said to have

---

[4]   The state habeas court noted in its Findings of Fact and Conclusions of Law that it was "well acquainted" with trial counsel and certain law enforcement officers. Petitioner argues that the state habeas court's findings of fact are not entitled to deference because they were based on affidavits from persons with whom the state judge was acquainted. While the Court agrees that genuine issues of material fact should not be resolved through competing affidavits, a habeas court may properly base its decision on factual findings from affidavits where, as here, the petitioner fails to present contradicting evidence to raise a fact dispute. *See Green v. Johnson*, 160 F.3d 1029, 1046 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1107 (1999) ("Green's 'speculative ruminations regarding [his] claim] are insufficient to overcome the strength of the affidavits presented by the prosecution . . . .") (pre-AEDPA).

(

'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission." *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1578 (1999). Even in cases where the record does not establish that Petitioner "failed to develop" the factual basis for his claim in state court, the federal district court has discretion whether to conduct an evidentiary hearing. *Id.* (citing *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998)). An evidentiary hearing is not required if there are "no relevant factual disputes that would require development in order to assess the claims." *See id.* A federal habeas court properly denies an evidentiary hearing "when the only basis offered to establish a disputed fact question was an inadmissible affidavit." *Breathard v. Johnson*, 177 F.3d 340, 349 (5th Cir.), *cert. denied*, 120 S. Ct. 380 (1999).

The AEDPA's standards of federal habeas review apply to claims which were "adjudicated on the merits" by the state court. 28 U.S.C. § 2254(d); *see also Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999). Under the AEDPA, an "explicit denial of relief by the Texas Court of Criminal Appeals of [the petitioner's] claims qualifies as an 'adjudication on the merits' entitled to deference under AEDPA." *Trevino v. Johnson*, 168 F.3d 173, 181 (5th Cir. 1999); *see also Miller v. Johnson*, __ F.3d __, 2000 WL 4950 *6 (5th Cir. Jan. 5, 2000) (denial of relief by Court of Criminal Appeals is a denial of relief on the merits). If the state habeas decision did not address an issue, the federal habeas court "should 'look through' to the last clear state decision on the matter." *Jackson*, 194 F.3d at 651.

The Court must evaluate each claim for relief individually. Relief based on cumulative error is available only where "(1) the individual errors involved matters of

(

constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (internal quotations and citations omitted), *cert. denied*, 519 U.S. 1094 (1997). "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Id.*

<h3 align="center">PETITIONER'S CLAIMS FOR RELIEF[5]</h3>

## I.   ACTUAL INNOCENCE

Petitioner alleges that he is entitled to federal habeas relief from his capital murder conviction and resulting death sentence because he is innocent.  Petitioner alleges (1) that Delton has now confessed to murdering Gracie Purnhagen; (2) that corroboration of Delton's accomplice witness testimony was "false, unreliable, or implicates Delton . . ."; (3) that Delton previously committed similar attacks; and (4) that the murders were cult related.

As an initial matter, Petitioner's claim of actual innocence does not provide an independent basis for federal habeas relief.  Additionally, Petitioner has not presented evidence which satisfies the standard for an "actual innocence" claim under either *Herrera v. Collins*, 506 U.S. 390 (1993), or *Schlup v. Delo*, 513 U.S. 298 (1995).  On each of these bases, the Court denies relief.

---

[5]   The headings in this section which are denominated by Roman numerals are stated in accordance with Petitioner's characterization of his claims in the Petition.  The headings do not in any way reflect the Court's ruling on Petitioner's claims.

(

## A.   Actual Innocence Is Not an Independent Basis for Federal Habeas Relief

In support of his "actual innocence" claim for relief, Petitioner cites *Herrera* and *Schlup*. Neither case supports Petitioner's argument that he may assert an independent claim for federal habeas relief based on his allegation that he is innocent.

In *Herrera v. Collins*, the United States Supreme Court noted that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera*, 506 U.S. at 400. While recognizing that a petitioner whose claims are otherwise barred from consideration as an abuse of the writ may obtain federal review of those claims upon a showing of actual innocence, the Supreme Court clearly held that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404. This is true because a defendant who has received a fair trial and been convicted no longer enjoys the presumption of innocence. *Id.* at 399. "Thus, in the eyes of the law, petitioner does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law of [a] brutal [murder]." *Id.* at 399-400.

Similarly, in *Schlup v. Delo*, the Supreme Court again noted that "Schlup's claim of innocence does not by itself provide a basis for relief." *Schlup*, 513 U.S. at 315. The Supreme Court held that "if a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that

(

the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Id.* at 316.

The Fifth Circuit has repeatedly recognized that Supreme Court jurisprudence does not support an independent claim for federal habeas relief based on an allegation of actual innocence. *See Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999)(*pet. for cert. filed* June 21, 1999); *Robison v. Johnson*, 151 F.3d 256, 267 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1578 (1999); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir.), *cert. denied*, 119 S. Ct. 4 (1998).

The controlling case law from both the Fifth Circuit and the United States Supreme Court precludes Petitioner's independent claim for relief based on his assertion of actual innocence. The Court denies federal relief based on this claim.

**B.      Petitioner's "Evidence" Does Not Show Actual Innocence**

Because the Supreme Court in *Herrera* discussed the standard for establishing a claim of actual innocence if one arguably existed and because the Petition contains procedurally defaulted claims which could be considered by this Court upon a showing of actual innocence, the Court has considered Petitioner's actual innocence claim on the merits. The Court has carefully and thoroughly examined the full record, including Delton's testimony at the evidentiary hearing held January 7, 2000. Based on this review, the Court finds that Petitioner does not satisfy either the standard for an independent claim for relief based on actual innocence, if one exists, or the lesser standard for a claim of actual innocence asserted to permit consideration of defaulted claims.

(

### 1.   Applicable Standards

In *Herrera*, the Supreme Court stated that, assuming *arguendo* an independent claim for habeas relief based on actual innocence existed, the petitioner would need to satisfy an "extraordinarily high" threshold showing by making "a truly persuasive demonstration of 'actual innocence' . . . ." *Herrera*, 506 U.S. at 417.

To establish actual innocence for purposes of avoiding procedural default, the petitioner must "establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial." *Schlup*, 513 U.S. at 316 (emphasis in original). Petitioner must support his claim with "new reliable evidence." *Id.* at 324. Petitioner must "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

Petitioner satisfies neither standard.

### 2.   Allegation that Delton Has Confessed to Murdering Gracie Purnhagen

Petitioner asserts that, since the time of trial, Delton confessed to murdering Gracie.[6] In support of this assertion, Petitioner has submitted statements allegedly made by Delton's cousin, Billy Dowthitt, to state habeas counsel and investigator and to Billy's father. In the numerous statements, Billy has given conflicting accounts of a conversation in prison during

---

[6]   The state habeas court found that "Delton Dowthitt did not recant his trial testimony." FFCL, at 1127, ¶ 20. Not only has Petitioner failed to establish that this finding was unreasonable, this Court makes the same finding based on Delton's testimony at the evidentiary hearing.

CHMPDF - www.fastio.com

(

which Delton allegedly told Billy either that he killed both girls or that he killed his "girlfriend."[7]

Petitioner also presents unsigned affidavits attributable to David Tipps and a defense investigator's account of a conversation with David Tipps.[8]  The unsigned Tipps affidavit and the investigator's account contain statements that Delton told fellow inmate Tipps that Delton killed Delton's girlfriend and her sister.

The proffered statements regarding what Delton allegedly told fellow prison inmates are inadmissible hearsay under the Federal Rules of Evidence.  *See* FED. R. EVID. 801.  The statements do not fall within any of the hearsay exceptions, including Rule 804(b)(3).  Even if admissible, the Billy Dowthitt statements are conflicting and "fail to provide a convincing account" of any conversation between Billy and Delton.  *See, e.g., Herrera*, 506 U.S. at 418. Indeed, given the internal inconsistencies in Billy's statements and the contradictions with uncontested matters,[9] Billy's statements have no indicia of reliability.

The relevant, admissible evidence regarding Petitioner's claim that Delton recanted his trial testimony and confessed to murdering Gracie was presented at the evidentiary

---

[7]  The state habeas court found that "Billy Dowthitt never stated that Delton Dowthitt said he killed both girls."  FFCL, at 1127, ¶ 18.  Petitioner has not established that this finding is unreasonable in light of the evidence presented at the state habeas level.

[8]  Tipps was called as a witness by the defense during the guilt-innocence phase of Petitioner's trial.  Outside the presence of the jury, Tipps asserted his rights under the Fifth Amendment, refusing to testify under oath that Delton made the statements regarding killing both girls. Trial Transcript ("Tr."), at XXXIII:1074-85.

[9]  For instance, some of Billy's statements reflect that he believes Delton told him that Delton "strangled" his girlfriend, but the uncontroverted evidence is that Gracie, the 16-year-old who had dated Delton, was not strangled but died because her throat was slashed.  Tiffany, the 9-year-old, had been strangled, a murder for which Delton pleaded guilty.

(

hearing on January 7, 2000.  At that time, Delton testified clearly, unequivocally, and credibly that he killed only Tiffany and that his father, Petitioner in this case, killed Gracie. The Court finds without reservation that Delton has not confessed or otherwise recanted his trial testimony, but instead testifies consistently under oath that his father killed Gracie. Petitioner's allegation to the contrary is rejected as unsupported by the record.

## 2.    Allegedly "False, Unreliable" Corroboration

Petitioner argues that his actual innocence is established by the "false, unreliable" nature of the corroboration of Delton's accomplice witness testimony.[10]   Petitioner specifically challenges the corroborating evidence:  (1) that Gracie Purnhagen's blood was on a beer bottle found at Petitioner's auto shop; (2) that Petitioner admitted being present during the commission of the crime; (3) that there were blood spatters on his shirt; (4) that Petitioner's statement to "Aunt Dixie" that he "did it and made Delton do it" referred to the murders; (5) that he asked his daughter, Darla, for forgiveness; and (6) that the knife introduced into evidence as the murder weapon belonged to Petitioner.

Initially, the claim fails to support Petitioner's request for federal habeas relief because there is no constitutional requirement for corroboration of accomplice testimony. *See Caminetti v. United States*, 242 U.S. 470, 495 (1917); *United States v. Rasco*, 123 F.3d 222, 229 (5th Cir. 1997), *cert. denied*, 520 U.S. 1083 (1998).  This Court reviewed Delton's

---

[10]    The Texas Court of Criminal Appeals considered the corroboration issue on direct appeal of Petitioner's conviction.  After discussing the applicable legal principles, the Texas Court of Criminal Appeals concluded that "Delton's testimony was sufficiently corroborated." *Dowthitt*, 931 S.W.2d at 250.  The Texas Court of Criminal Appeals was the last court to address this issue on the merits.

(

trial testimony, and the Court heard and observed Delton as he testified in the evidentiary hearing in this proceeding. This Court found Delton to be a credible witness, regardless of whether his testimony is corroborated by other evidence.

As discussed below, however, the Court has considered the merits of Petitioner's challenges to the corroborating evidence. The Court finds that the Texas Court of Criminal Appeals' decision that "Delton's testimony was sufficiently corroborated" is neither contrary to nor an unreasonable application of clearly established federal law.

*Blood on the Beer Bottle.* -- Petitioner challenges the reliability of the corroborating evidence that blood on the beer bottle[11] was from a group of donors remaining after DNA analysis excluded 95% of the relevant population and that Gracie was among the 5% remaining. Petitioner alleges in connection with his innocence contentions that the chain of custody for the blood scrapings and the liver sample from Gracie were not established. This claim is not supported by the trial record. Trial testimony from the medical examiner, law enforcement officers, and forensic examiners established the chain of custody for the evidence and defense counsel's objections based on the chain of custody were properly overruled by the trial court.

Petitioner also challenges the validity of the DNA evidence but, as discussed more fully in connection with Petitioner's DNA claim, the reliability of the evidence was

---

[11]     Petitioner repeatedly characterizes the blood scrapings as coming from a knife rather than from the beer bottle. As discussed more fully in a later section, the state habeas court found that the scrapings came from the beer bottle and Petitioner has not presented clear and convincing evidence to rebut the presumption of correctness to which the state habeas court's finding is entitled.

established through testimony at trial. Petitioner argues that "DNA testing proved nothing about the contributor of the scrapings." Petition, at 52. To the contrary, as discussed more fully in a later section, the DNA testing proved that Gracie Purnhagen was among the 5% remaining after 95% of the relevant population was excluded through DNA testing.

Petitioner also challenges the State's failure to perform DNA testing "on the bottle itself or on other items that should have been tested." Petition, at 55. The record establishes that DNA testing was performed on the blood found on the bottle (Tr., XXXII:903); the knife which was introduced into evidence did not have enough blood on it to determine even whether it was human blood (*id.* at XXVIII:267); and the clothing worn by Delton and Petitioner on the night of the murders was thrown into a dumpster which was emptied before it could be searched by law enforcement officers (*id.* at XXIX:426, 560). None of Petitioner's DNA challenges raise a doubt as to the corroborative effect of the DNA evidence.[12]

*__Admitted Presence at Murder Scene.__* -- As discussed more fully in a later section, the State properly established that Petitioner stated "I was there the whole time." The State's evidence was neither false nor unreliable, and the statement was properly admitted as Petitioner's admission to being present at the pipeline at the time of the murders.[13]

---

[12]    Petitioner concedes that "state habeas counsel's DNA tests established that Delton Dowthitt and [Petitioner] were both eliminated as contributors of the blood contained in the 'scrapings.'" Petition, at 53.

[13]    The State did not introduce the statement as Petitioner's admission of murder, only as an
(continued...)

*Blood of Petitioner's Shirt.* -- Kellie Holloway, the 19-year-old girlfriend of Petitioner's son Stacey, testified at trial that she saw Petitioner on the night of the murders and his shirt had stains on it that looked like blood.  Tr., at XXVIII:362.  Marcia Holloway, Kellie's sister, testified at trial that she also saw Petitioner on the night of the murders and he had blood splattered on his shirt.[14]  *Id.* at XXVIII:375.  These witnesses were not inherently unreliable.  They admitted that their view of Petitioner was limited to seeing him through a car window, but each witness testified to having seen the spots on Petitioner's shirt.  Additionally, during preliminary discussions in connection with the polygraph examination, Petitioner admitted having blood on his shirt the night of the murders.

The jury, having heard the evidence, could properly assess its weight.  It was not unreasonable for the jury to determine that the Holloway sisters' testimony was credible and corroborated Delton's testimony.

*Statement to Aunt Dixie.* -- Dixie Becker, Petitioner's aunt, testified at trial regarding a statement made shortly after the murders.  Over defense counsel's strenuous objection, Ms. Becker testified that a few days after the murders Petitioner told her privately,

---

[13]    (...continued)
admission of his presence.

[14]    Petitioner argues that the testimony from the Holloway sisters was unreliable because they had "no training whatsoever in blood spatter analysis" and the "word 'spatter' is a term of art used by experts in that field, not one commonly used by teenage girls."  Petition, at 59-60.  The record establishes, however, that the Holloway sisters used the common word "splatter," not the term of art "spatter."  *See* Tr., XXVIII:362 ("He had stains on his shirt that were splattered."); XXVIII:375 ("he had blood splattered on the front of it.").  On cross-examination, Marcia Holloway defined the word "splatter" as meaning, "It was not all in one -- not all together.  It was like all spread out (indicating)."  *Id.* at XXVIII:377.  It was proper to permit the jury to assess the probative value of this evidence.

"Aunt Dixie, I did it and I made Delton do it." Tr., XXXII:1002. Ms. Becker testified that Petitioner did not explain his statement. *Id.* at XXXII:1009.

Petitioner now submits an affidavit from Ms. Becker stating that at the time she testified at trial she did not know about "molesting, sexual deviant acts . . . & incest." Becker Affidavit, Exh. 69 to Petition, ¶ 5. Ms. Becker further stated in her affidavit that had she known of these acts, she "would not have been so certain that the statement meant only that which I thought at the time of trial." *Id.*

The Becker affidavit does not raise a doubt about either the corroborative effect of the statement or Petitioner's guilt. Ms. Becker did not testify at trial regarding what she thought the statement meant. She merely testified that the statement was made. The jury considered the statement and reached its own decision regarding what it meant and whether it corroborated Delton's testimony.

*__Request for Forgiveness from Darla__.* -- Darla Dowthitt Garcia ("Darla"), Petitioner's daughter, testified at trial that the morning after the murders, Petitioner telephoned her and asked if she would "forgive him for what he's done." Tr., XXVIII:388. Darla testified that when she asked Petitioner if he was talking "about Sunday," he said, "no, about yesterday." *Id.*

Petitioner argues that he was *actually* asking his daughter for forgiveness "for his own treatment of her on a camping trip" and that the request for forgiveness was not made by telephone, but in person. Petition, at 62. Again, the Court concludes that the new explanation for his statements to Darla is not evidence of actual innocence. Darla testified

only to the making of the statement, not regarding any possible meaning. The jury, hearing all the evidence presented at trial, made its own decisions regarding the evidentiary and corroborative value of Darla's testimony.[15] If believed by the jury, Darla's testimony clearly corroborated Delton's testimony.

*Knife Belonged to Petitioner*. -- Darla testified at trial that the knife introduced into evidence was her father's. Tr., XXVIII:388. Darla testified that she had seen and used the knife several times on camping trips. *Id.* Donna Dowthitt Beeson, another of Petitioner's daughters, testified that Petitioner carried a knife all the time. *Id.* at XXXI:851. Darlene Dowthitt Glover, Petitioner's sister, testified that Donna Dowthitt was not around Petitioner much during the first part of 1990. *Id.* at XXXI:856. Petitioner argues that this testimony failed to corroborate Delton's testimony.[16]

Again, the evidence was presented, and the jury determined whether or not they found it credible. "Federal courts are not forums in which to relitigate state trials." *Herrera*, 506 U.S. at 401 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).

*Conclusion*. -- The claims challenging the corroboration evidence are not established by the record either as a "truly persuasive demonstration" of actual innocence or as a showing that it is more likely than not that no reasonable juror would have convicted

---

[15]   Petitioner's arguments regarding evidence that Darla was under felony indictment at the time of Petitioner's trial is addressed in the section regarding allegations of State misconduct.

[16]   During his interrogation, Petitioner stated that the murder weapon was one of the knives kept around his auto shop. Videotape, Tape 3 of 3, Exh. 81 to Petition.

Petitioner if presented with the new "evidence." Petitioner's challenges to the corroborating evidence do not establish his innocence.

### 4.    Prior Similar Assaults by Delton

Petitioner alleges that Delton previously attacked Jamie Havard, raping her, choking her on one occasion, and threatening her with a knife on another.[17]   In support of this allegation, Petitioner presented a law enforcement investigation report.   Supplementary Investigation Report, Hearing Exh. 2, ¶ 5.  Petitioner did not present an affidavit from Jamie Havard.

The law enforcement investigation report is improper impeachment and inadmissible hearsay under the Federal Rules of Civil Procedure.  *See* FED. R. EVID. 404(b), 608(b), 801, 803(8).  Even if admissible, the alleged statements of Jamie Havard do not possess indicia of reliability.  The statement indicates that Jamie Havard had been Delton's girlfriend and

---

[17]    In addition to the allegation that Delton attacked Havard, Petitioner alleges that Delton attacked a homeless man.  At the evidentiary hearing regarding the claim that Delton had recanted his trial testimony and confessed to murdering Gracie Purnhagen, Petitioner proffered an unsigned statement that Pamela Melton would testify that her friend "Duke" was stabbed by Delton (Evidentiary Hearing Exhibit 4) and an unsigned statement that "Duke" would testify that Delton stabbed him (Evidentiary Hearing Exhibit 9).  These statements are not signed, are not under oath, and are inadmissible hearsay with absolutely no indicia of reliability.  Additionally, Delton testified at the evidentiary hearing that he had never stabbed anyone in the back.

In addition, the Court specifically rejects the statement in the "Duke" proffer that Petitioner could have located Duke "had Petitioner been granted the reasonable funding he requested from this court . . . ."  Duke Proffer, Exh. 9, ¶ 2.  Petitioner's requests for funding for specific purposes have been granted and this Court has authorized thousands of dollars for investigative expenses requested by Petitioner.  The statement in the Duke Proffer regarding denials of investigation funding for this particular purpose is both patently false and incomprehensible in light of the Court's permissive authorizations of investigator and attorneys' fees and expenses in this case.

that she knew that Delton and Gracie dated. There is no evidence in the record that Havard reported the alleged attacks before being questioned regarding Gracie's murder.

Even if deemed admissible and reliable, the Havard statement does not raise a doubt as to Petitioner's guilt. Delton admits his participation in the murders, testifying at trial and at the evidentiary hearing that he strangled Tiffany. The alleged attacks on Havard do not provide evidence that Petitioner did not also participate in the murders, killing and sodomizing Gracie as described in Delton's testimony.

The statements attributed to Havard present neither a "truly persuasive demonstration" of actual innocence or a showing that it is more likely than not that no reasonable juror would have convicted Petitioner if presented with the Havard statement.

### 5. Cult-Related Murders

As proof of his actual innocence, Petitioner alleges that the murders of Gracie and Tiffany Purnhagen were "a cult-related ritualized killing." Petition, at 66. Petitioner addressed this claim more fully in relation to his ineffective assistance of counsel claim, and this Court will do likewise. As more fully explained in the following section, Petitioner's allegation that the murders were "cult-related" is nothing more than imaginative fiction without any evidentiary support. The argument fails to raise a fact-based doubt as to Petitioner's guilt and falls well short of a "truly persuasive demonstration" of actual innocence. Nor does this fiction meet the lesser standard that it is more likely than not that no reasonable juror would have convicted Petitioner if presented with the "cult-related" argument.

## C.    Conclusion

To the extent that Petitioner is attempting to assert an independent claim for federal habeas relief based on his allegation that he is innocent, there is no legal basis on which to recognize such an independent claim.  If such an independent claim arguably existed, Petitioner does not satisfy his burden of proof to make a "truly persuasive demonstration" that he is actually innocent.  *See Herrera*, 506 U.S. at 417.  The trial transcript, the exhibits at trial, the state court record, and the supplemental materials submitted by Petitioner in this federal habeas proceeding clearly establish Petitioner's guilt beyond a reasonable doubt.

To the extent Petitioner argues that he is actually innocent of the murder of Gracie Purnhagen as a means of avoiding procedural default arguments raised by Respondent, Petitioner's argument fails because he has not shown that it is more likely than not that no reasonable juror would have found him guilty of Gracie's murder if informed of the matters raised in this Petition.   Additionally, as discussed more fully herein, Petitioner has not identified and established a constitutional error that "'probably' resulted in the conviction of one who was actually innocent."  *See Schlup*, 513 U.S. at 321.

Based on the foregoing, the Court denies federal habeas relief based on Petitioner's asserted claim of actual innocence.  The Court further concludes that Petitioner has not presented evidence of actual innocence necessary to permit consideration of procedurally defaulted claims where cause and prejudice are not proven.

## II. PETITIONER WAS DENIED THE RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

Petitioner alleges that he was denied his constitutional right to the effective assistance of counsel. Petitioner summarizes his allegations as follows:[18]

- counsel failed to conduct an independent investigation and interviewed none of the state's witnesses;

- counsel failed to prepare adequately for trial and, as a result, was unable to challenge the reliability of the state's physical evidence;

- counsel failed to prepare and present a defense, despite the availability of potential witnesses and evidence;

- counsel failed to consult with necessary experts prior to trial;

- counsel failed to present an adequate defense by failing to present necessary expert witness testimony at trial;

- counsel presented inadequate and deficient closing arguments at both stages of the trial;

- counsel failed to conduct an investigation into Petitioner's mental status, ranging from his potential mental irresponsibility at the time of the commission of the offense to his lack of capacity to form the required *mens rea* for the alleged offense to his lack of competence to stand trial;

- counsel failed to conduct an adequate and meaningful mitigation investigation;

- counsel failed to prepare adequately for the punishment phase;

---

[18] This list reflects the manner in which Petitioner summarized his allegations of ineffective assistance of counsel at pages 75 and 76 of the Petition. The allegations are discussed herein, however, as set forth in the numbered claims in Section D of Petitioner's Ineffective Assistance of Counsel Claim.

(

- counsel provided objectively deficient representation during the penalty phase by failing to use an independent mental health expert as a witness, to use a favorable report of the defense mental health expert, and by adopting the state's mental health expert for the defense despite his extremely damaging testimony; and

- counsel failed to prepare and present pretrial and post-trial motions in a timely and legally sufficient fashion.

Petition, at 75-76. The state habeas court found that "counsel rendered reasonably effective assistance of counsel." FFCL, at 1134, ¶ 13. The state habeas court also made specific factual findings on the underlying allegations, which will be discussed more fully herein.

## A.    Standard for Ineffective Assistance of Counsel Claim

"The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted -- even if defense counsel may have made demonstrable errors -- the kind of testing envisioned by the Sixth Amendment has occurred." *United States v. Cronic*, 466 U.S. 648, 656 (1984).

To prevail on his claim of ineffective assistance of counsel, Petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), by showing both a deficiency in counsel's performance and resulting prejudice. *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999). "Because an ineffective assistance of counsel claim is a mixed question of law and fact, [the Court looks] to whether the state court decision rested on an unreasonable application of clearly established federal law." *Id.* (citations omitted). The underlying findings of fact on which the decision is based, however, are entitled to a

presumption of correctness. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir.), *cert. denied*, 120 S. Ct. 369 (1999).

The first prong of the *Strickland* analysis requires a showing that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *Kitchens*, 190 F.3d at 701. Petitioner must establish "that his trial counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." *Crane*, 178 F.3d at 312 (citations omitted). In meeting this requirement, Petitioner must overcome the strong presumption that counsel was competent. *Strickland*, 466 U.S. at 689; *Kitchens*, 190 F.3d at 701. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Kitchens*, 190 F.3d at 701 (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).

Secondly, Petitioner must prove that he suffered actual prejudice as a result of the ineffectiveness and that, but for counsel's inadequacies, there is a reasonable probability that the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694; *Kitchens*, 190 F.3d at 703. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Crane*, 178 F.3d at 312 (quoting *Strickland*, 466 U.S. at 694). "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong." *Crane*, 178 F.3d at 312.

Petitioner has failed to satisfy either prong as to any element of his ineffective assistance of counsel claim.

## B.   Alleged Failure to Conduct an Independent Investigation

Petitioner alleges that trial counsel "failed to conduct an independent investigation of the state's case at the guilt/innocence trial and interviewed none of the state's witnesses in preparation for trial." Petition, at 79.

### 1.   Failure to Interview Family Members

Petitioner complains that trial counsel did not talk to Petitioner's family and failed to gather medical or mental health records.[19]   Trial counsel admit in their affidavit that they did not talk with many of Petitioner's family members, but state that they understood that Petitioner did not want his family members testifying at trial.   Counsel Affidavit, Exh. 2 to Petition, at 2.[20]

---

[19]   Petitioner also alleges that trial counsel "did not even hire an investigator." Petition, at 81. The record establishes that Omar Leon Ringo worked as an investigator for defense counsel in connection with Petitioner's trial. *See* Tr., XXXIII:1182. Petitioner's allegation that counsel "did not even hire an investigator" is clearly refuted by the record.

[20]   The state habeas court found that Petitioner failed to obtain and present affidavits from family members. FFCL, at 1126-27, ¶¶ 10-17. Petitioner argues in this proceeding that he was unable to obtain the family-member affidavits "[d]ue to lack of state funding for investigation" and the United Parcel Service strike. Response, at 2-3. It is incomprehensible that "state funding" is necessary for counsel to obtain affidavits from Petitioner's wife and other family members who were allegedly willing to cooperate with Petitioner. The absence of guarantees of overnight delivery do not excuse or even explain Petitioner's failure to obtain and submit the necessary affidavits prior to the eleventh hour. Also, the state habeas court had granted prior extensions of time requested by Petitioner, and there is no showing that a requested extension for purposes of submitting appropriate affidavits would not have been similarly granted.

Having failed to develop the factual basis for this and other claims through affidavits easily obtainable from Petitioner and his family, this Court "shall not hold an evidentiary hearing on the claim." *See* 28 U.S.C. § 2254(e)(2). Nonetheless, the Court has reviewed the affidavits which Petitioner submitted in connection with this federal habeas proceeding. Petitioner's son, Stacey Dowthitt, states in his affidavit that he met with defense counsel; that he volunteered to testify in Petitioner's behalf; that he has a good opinion of Petitioner; and that
(continued...)

The state habeas court found that Petitioner "did not want any of his family testifying on his behalf." FFCL, at 1131, ¶ 61.   Additionally, the state habeas court found that "trial counsel attempted to talk to Darla Dowthitt in preparation for trial, but she refused to talk with them." *Id.* at 1131, ¶ 69.  These findings are fully supported by the record.

Trial counsel stated in their affidavit that they talked "to anyone who would talk to us" and that some of the people to whom they spoke "had knowledge of factors that . . . would be extremely detrimental to Dennis Dowthitt and would in all probability be revealed under the State's cross examination."  Counsel Affidavit, Exh. 2 to Petition, at 2.  Trial counsel stated specifically that they spoke with Stacey Dowthitt (*id.* at 3) and with Dennis E. Dowthitt (*id.* at 4).  Indeed, as found by the state habeas court and as established by the trial transcript, Dennis E. Dowthitt was called to testify at trial as a defense witness.  FFCL, at 1131, ¶ 62; Tr., at XXXIII:1132-39.

### 2.      Failure to Gather Medical and Mental Health Records

Trial counsel stated in their affidavit that they did not gather medical and mental health records because they had no knowledge that Petitioner alleged he had brain damage,

---

[20]     (...continued)
defense counsel did not ask him about Delton.  Stacey Dowthitt Affidavit, Exh. 52 to Petition. Petitioner's ex-wife, Danna Taft, states in her affidavit that nobody asked her about Petitioner's alleged strange behavior and she did not volunteer the information to anyone; that she met with Petitioner's trial counsel; and that her eight brothers would have testified as character witnesses for Petitioner.  Taft Affidavit, Exh. 54 to Petition.  Petitioner's sister, Darlene Glover, describes Petitioner's abusive childhood; offers inadmissible hearsay that she heard that her father paid $5,000 to defense counsel; and offers inadmissible hearsay that Petitioner had shock treatments at the "State Hospital."  Glover Affidavit, Exh. 56 to Petition. These affidavits are not "sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.*

(

because Petitioner appeared sane and competent at all times, and because the psychiatric expert retained by defense counsel found no indication of incompetence or symptoms of brain damage. *Id.* at 6. Petitioner has submitted no evidence which refutes counsel's affidavit.

### 3. Failure to Challenge State's Version

Petitioner also alleges that defense counsel "deferred at every turn to the state's version of the events" and "never looked for any evidence with which to challenge the state's version . . .." Petition, at 84.[21] Trial counsel stated in their affidavit, and there is no evidence to the contrary, that they hired a DNA expert (Counsel Affidavit, at 10-11), a fingerprint expert (*id.* at 11), and a psychiatric expert (*id.* at 6). Each of these experts agreed with the State's reports and/or made findings detrimental to Petitioner's defense.

### 4. Failure to Conduct Background Investigation of Witnesses

Petitioner also complains that trial counsel failed to undertake any background investigation of the State's witnesses.

***Darla Dowthitt.*** -- Petitioner complains that trial counsel failed to investigate Darla's background and, had they done so, they would have discovered that she was under felony indictment at the time she testified at Petitioner's trial. As discussed more fully below, the evidence of a felony indictment, if discovered earlier by trial counsel, would not have been admissible.

---

[21]     Petitioner blames the alleged deficient performance on counsel's "mistaken perception" that Petitioner had confessed to being present at the murder scene. Petition, at 83. As discussed more fully in other sections of this Memorandum and Order, the record establishes that Petitioner clearly admitted to being present at the scene.

(

***Greg Hunt***. -- Petitioner complains that trial counsel failed to investigate Greg Hunt, who had written a letter to the judge presiding over his unrelated criminal charges mentioning his cooperation in Petitioner's case and asking for consideration in his own case. As was true with Darla's felony indictment, there is no evidence that Greg Hunt subjectively believed that he had a "deal" with the government in exchange for his cooperation in Petitioner's prosecution. Additionally, the record establishes that Greg Hunt admitted at trial that he was then in the Montgomery County Jail serving time for his third DWI offense. Tr., XXVI:61.

***Delton Dowthitt***. -- Petitioner also complains that trial counsel failed to investigate Delton's background.[22] Petitioner alleges that Delton has a history of torturing animals, attempting to rape a girlfriend, stabbing someone, soliciting murder, and other juvenile offenses. Petitioner complains that although "the media had talked to people who stated that Delton was a bad person, linking him to drugs and violence, the trial attorneys made no attempt to follow up on any of these people." Petition, at 87.

The record establishes that trial counsel knew, through statements made by Rich Schuschu and Dr. Quijano, about Delton's prior bad acts and attempted to introduce them at trial. The trial court properly excluded the evidence of Delton's alleged prior bad acts. Tr., at XXXIII:1037.

---

[22] The state habeas court found that "trial counsel investigated Delton's background." FFCL, at 1131, ¶ 71. This finding is supported by the record and is entitled to a presumption of correctness.

(

*Cult-Related Murders.* -- In connection with his claim that trial counsel failed to investigate Delton's background, Petitioner presents the creative theory that the murders were "cult-related" and that Delton was "known to practice the kinds of acts frequently associated with teenage satanic cults." Petition, at 88. This argument is patently frivolous.

"[T]he Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984). "'[C]ontentions that in the face of the record are wholly incredible' will not entitle one to discovery or a hearing." *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).

The physical evidence in the case does not support Petitioner's "cult" theory. The girls were murdered through different means -- both being common methods of committing murder; only one was sodomized or otherwise sexually abused; and there was nothing at the murder scene to suggest the performance of a cult ritual. Contrary to Petitioner's argument, there is nothing about the age of the victims which raises a reasonable inference that their murders were cult-related. Most telling, Petitioner admitted being present at the pipeline immediately before and immediately after the murders took place and described nothing that would raise an inference of cult ritual activity.

Petitioner supports his "cult" theory with photographs depicting graffiti spray-painted in front of a local Montgomery County dentist's office and with evidence he argues indicates that Delton was a cult member. The graffiti on which Petitioner relies included, *inter alia,*

(

a skull containing a swastika and the word SATAN, and the phrase "Gracie and Tiffany are dead!" *See* Petition, at 88. Petitioner offers no evidence regarding who painted the graffiti or when they may have done so. Instead, he relies on illogical supposition that "[i]f these photographs were taken before the bodies were discovered, or before the story of the murders appeared in the press, it is more likely that Delton himself drew the graffiti, or someone he had told about the murders drew the graffiti." Petition, at 91.

The only evidence in the record on this issue is Hidalgo's affidavit, filed in the state habeas proceeding, that the report of the graffiti was received after Richard Schuschu, Delton, and Petitioner were already in custody. Hidalgo Affidavit, State Court Record, IV:803. Based on this uncontroverted affidavit, the state habeas court found that "the graffiti was made known to [Hidalgo] by a citizen after all suspects had been arrested and statements taken from them." FFCL, at 1133, ¶ 89. This finding is fully supported by the record and is entitled to a presumption of correctness.

The evidence on which Petitioner relies to support his argument that Delton was a member of a cult is equally without probative value. Petitioner alleges, with questionable hearsay evidence, that Delton once drowned a cat, that he wanted to kill a homeless person to see what it felt like, that a friend of Gracie described Delton as a "jealous weirdo," and that Rich Schuschu's girlfriend's mother stated that Delton had a violent past and tortured animals. *See* Petition, at 88-89. Petitioner also characterizes Delton's tattoos[23] as "Satanic

---

[23]    Delton testified during the January 7, 2000 evidentiary hearing that he has a tattoo that consists of a ribbon with Gracie's name in it and one of a ribbon with Tiffany's name in it. Delton showed the tattoos to the Court and explained that he got the tattoos in 1993 (while
(continued...)

(

symbols." None of this "evidence" raises a reasonable inference that Delton was a cult member. Moreover, none of the "evidence" proffered by Petitioner to support his cult theory "rule[s] out [Petitioner] as being involved in the killings." *See* Petition, at 91.

Petitioner's argument that trial counsel provided constitutionally ineffective representation because they failed present an argument that the murders were cult-related is frivolous at best. Trial counsel are not required to destroy their credibility before the jury by presenting fanciful theories that have no evidentiary tie to reality.

### C. <u>Alleged Failure to Challenge Properly the Reliability of the State's Physical Evidence</u>

Petitioner alleges that trial counsel "failed to prepare adequately for trial by virtue of being unprepared to and unable to challenge the reliability of the state's physical evidence admitted against Mr. Dowthitt." Petition, at 93. Specifically, Petitioner argues that trial counsel should have challenged the knife, the fingerprints, and the DNA evidence. Petitioner's allegations are refuted by the record.

#### 1. The Knife

A knife was introduced into evidence as the murder weapon. Petitioner states that "counsel failed to cross-examine any one of [the] women [who testified] regarding the pocketknife . . .." Petition, at 94. Of the three females who testified about the knife, only Darla identified the knife as belonging to Petitioner. *See* Tr., XXVIII:388-89. Petitioner does not suggest any basis for cross-examination of Darla, other than the conclusory

---

23   (...continued)
in prison) "as a reminder of [his] mistakes."

(

assertion that Darla lacked "any personal knowledge of the pocketknife shown in the courtroom being either the Petitioner's pocketknife or the murder weapon." Petition, at 94. This assertion regarding a lack of personal knowledge that the knife belonged to Petitioner is contrary to Darla's testimony at trial.[24]  Darla testified unequivocally that she knew the knife belonged to Petitioner because she had "used it several times when we was [*sic*] on camping trips." *Id.* at XXVIII:388.

Petitioner also asserts that "habeas counsel has learned that Mr. Dowthitt owned many of these knives, all of them identical, which lay around his shop, and even his home." Petition, at 94.  The jury in Petitioner's trial learned this same information through the testimony of Dennis E. Dowthitt.  *See* Tr., XXXIII:1135-36 (Petitioner had more than one knife similar in nature to the one introduced into evidence); 1136 (Petitioner had "two or three, four" similar knives in and around his shop); 1136-37 (witness found some more knives identical to State's exhibit when shop was cleaned out after Petitioner's arrest).  It is clear from the record that trial counsel conducted the "basic investigative step of interviewing Dennis Dowthitt, Junior [*sic*], who . . . alerted trial counsel to the available testimony that could have been presented . . . in rebuttal to the 'identity' of the pocketknife . . .." *See* Petition, at 95.

---

[24]    Darla did not testify that the knife was the murder weapon.  That testimony was presented through Delton, who identified the knife as the murder weapon.  Tr., XXIX:417-18.

(

## 2. Fingerprint and DNA Evidence

The undisputed evidence, as cited above, establishes that trial counsel obtained

independent fingerprint and DNA experts.[25] That these experts were unable to provide

reports which challenged the reliability of the State's evidence or otherwise benefited

Petitioner is not a deficiency in trial counsel's performance.

## D. Alleged Failure to Prepare and Present a Defense

Petitioner alleges that "trial counsel failed to prepare and present a defense for

Petitioner, despite the availability of potential defense witnesses and evidence." Petition, at

97. Specifically, Petitioner alleges that trial counsel did not present a proper defense in

connection with the blood spatter evidence, the "blood on Delton Dowthitt's sweat pants,"

and the pocketknife. *Id.* at 97-99.

## 1. Blood Spatter Evidence

As discussed previously, Kellie and Marcia Holloway testified at trial that, when they

saw Petitioner on the night of the murders, he had blood splattered on his shirt. On cross

examination, defense counsel elicited an admission from Kellie that she was approximately

three feet away from Petitioner, that she did not conduct tests to determine whether the spots

she claimed to have seen were blood, and that there were maybe five spots on Petitioner's

shirt. Tr., XXVIII:364-68. Defense counsel also elicited cross-examination testimony from

---

[25]    The state habeas court found specifically that "trial counsel hired a qualified fingerprint expert
who confirmed the techniques used to enhance, and the identity of, the latent print on the
bottle with blood." FFCL, at 1132, ¶ 78.

(

Marcia that she only saw Petitioner through the open car window and that she was the farthest person away from that window. *Id.* at XXVIII:381, 383.

Trial counsel interviewed Stacey Dowthitt and Dennis E. Dowthitt, the two individuals who were with the Holloway sisters on the night of the murders. Dennis, when called as a witness for the defense, testified that he did not see blood on his father's shirt that night. Tr., XXXIII:1139.

Petitioner also alleges, citing the affidavit of his "forensic evidence expert" Ron Singer, that "had an expert been consulted, they [*sic*] myths that any spots on Mr. Dowthitt's shirt were blood and were deposited there because he cut Gracie's throat would have been exposed to the jury as mere speculation." Petition, at 98. This argument, however, ignores the uncontroverted evidence in the record that the clothes Petitioner and Delton wore on the night of the murder were placed in a dumpster which was emptied before law enforcement officers had the opportunity to search it for the clothing. *See* Tr., XXIX:426, 560.

### 2.    "Blood on Delton Dowthitt's Sweat Pants"

Petitioner concedes that trial counsel raised an alternate theory to explain the presence of blood on the beer bottle which contained Petitioner's fingerprint. Petitioner alleges, however, that counsel "did not use any witnesses to present this theory to the jury." This argument is refuted by the record. Delton testified that he cut himself so he and Petitioner would have an explanation for the blood on their clothes. Tr., XXIX:423. Buster Emmons, the State's crime scene investigator, testified on cross-examination that the blood was located on the part of the bottle "that would normally rest on a surface if it was standing up." *Id.*

(

XXXII:932.  As noted above, Petition argues that an expert should have been retained to test

Delton's clothes.  This argument is frivolous since it ignores the undisputed evidence that

the clothes had been thrown away and were not available for testing.

### 3.    The Pocketknife

Petitioner alleges that Dennis E. Dowthitt was "shown a bloodied knife by law

enforcement officers who told him it was the murder weapon."  Petition, at 99.  Petitioner

submits that the knife introduced in evidence was not the murder weapon because Dennis

was shown a knife with blood on it and the State's evidence indicated that the alleged murder

weapon with Petitioner's fingerprint on it contained only one small speck of blood.  *Id.* at

100-01.

The state habeas court found that "no bloody knife or knife 'covered with blood' was

recovered in this case."  FFCL, at 1129, ¶ 39.  This factual finding, which is supported by

the record, is entitled to a presumption of correctness unless rebutted by clear and convincing

evidence.[26]  In support of his allegation that Dennis was shown a bloody knife, Petitioner

presents the affidavit of Danna Taft, Petitioner's ex-wife, who states that Dennis told her that

the police officers showed him a bloody pocketknife.  Taft Affidavit, Exh. 54 to Petition,

¶ 10.  Petitioner also submits the affidavit of Dennis E. Dowthitt, who states that he does not

remember what happened when the officers showed him the knife.  Dennis Dowthitt

Affidavit, Exh. 53 to Petition, ¶ 5.  These affidavits from Petitioner's wife and son were

---

[26]    The Court notes that Dennis E. Dowthitt did not mention during his trial testimony that he
had been shown a bloody knife.  Instead, Dennis testified that the law enforcement officers
"just asked me whose it was and I said it is my father's.  That's all that was said."  Tr.,
XXXIII:1138.

easily obtainable for submission to the state habeas court, but they were not submitted. Moreover, on the merits, they do not present clear and convincing evidence that Dennis E. Dowthitt was shown a bloody knife which was the actual murder weapon.

### E.    Alleged Failure to Consult With and Present Necessary Experts

Petitioner alleges that trial counsel "failed to consult with the necessary and appropriate experts prior to trial, and . . . failed to present the necessary and appropriate expert witness testimony at trial." Petition, at 101. Petitioner's allegation that trial counsel failed to obtain fingerprint and DNA experts is refuted by the record, as discussed in prior sections. Petitioner also argues that trial counsel was constitutionally ineffective because they did not obtain a blood-spatter expert, a serology expert, an expert in hair analysis, and a forensic pathologist. Petitioner does not establish either deficient performance or prejudice based on these allegations.

### 1.    Blood-Spatter Expert

Petitioner argues that if trial counsel had obtained a blood-spatter expert, they would have learned that "it is impossible to link the 'spots' supposedly on Mr. Dowthitt's shirt to proving that he killed Gracie." Petition, at 103. Trial counsel elicited testimony from the Holloway sisters that they did not know how the blood may have gotten onto Petitioner's shirt (Tr., XXVIII:378) and did not run any tests on the blood spots (*id.* at XXVIII:367). Trial counsel also elicited testimony from the medical examiner on cross-examination that someone standing behind a person whose carotid artery is severed will "not get any type of blood spatters on them" and someone in front of a person with a severed carotid artery would

(

get blood "sprayed" on them, with the blood spray becoming "weaker and weaker until the heart stops." *Id.* at XXVIII:258-59.

Petitioner does not establish that trial counsel's failure to obtain a separate blood-spatter expert would have enabled trial counsel to deal with the "bloody shirt" evidence more effectively. Indeed, it can often be more effective to elicit beneficial testimony from the State's expert than to present the same evidence through an expert retained and paid by the defense.

### 2.    Serology and Hair Analysis Experts

Petitioner alleges summarily that trial "counsel did not consult with experts regarding the serological evidence" and "did not consult with experts in hair analysis." Petition, at 104. Petitioner does not even attempt to argue how this failure was deficient performance or prejudicial. The Court denies relief on this unsupported allegation.

### 3.    Forensic Pathologist

Petitioner opines that there was a "mix up at the morgue." Petition, at 104. This allegation was not presented to the state habeas court and, as a result, is barred under *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). *See, e.g., Jones v. Jones*, 163 F.3d 285, 297 (5th Cir. 1998), *cert. denied*, 120 S. Ct. 224 (1999); *Nobles*, 127 F.3d at 420. Additionally, Petitioner's Exhibit 21 establishes that the mix-up regarding the case numbers for the two murder victims was corrected almost immediately and well before the tissue samples were submitted for DNA testing.

(

Petitioner also argues that it was constitutionally ineffective assistance of counsel not to retain a forensic pathologist to "challenge the validity of the autopsy report, or investigate allegations of Gracie's pregnancy that were not addressed in state's autopsy report." Petition, at 105. By the time of trial, there was no genuine allegation that Gracie had been pregnant. Delton testified that Gracie had not told him that she was pregnant. Tr., at XXIX:411. The medical examiner testified that Gracie showed no sign of pregnancy. *Id.* at XXVIII:260. Petitioner has presented no evidence which indicates to the contrary that Gracie may have been pregnant.

Petitioner also alleges that "trial counsel did not seek funding for an expert to present in order to cast doubt upon the conclusions drawn by the state's pathologist." Petition, at 105. Petitioner does not explain what evidence an expert retained by defense counsel could have presented which would have cast such a doubt. In the Petition filed February 11, 1999, Petitioner represents that "habeas counsel's pathology expert is still reviewing the materials sent to Ron Singer . . . ." Petition, at 106. To date, no evidence from the pathology expert has been presented to "cast doubt upon the conclusions drawn by the state's pathologist."

F.      **Alleged Failure to Investigate Petitioner's Mental Status and Mitigation Evidence**

Petitioner alleges in related allegations 5-8 of the Petition that trial counsel failed to conduct an appropriate investigation, preparation and presentation of Petitioner's mental status and family history. Specifically, Petitioner states in allegation 5 that counsel failed to conduct an appropriate investigation into Petitioner's mental status, in allegation 6 that counsel failed to investigate mitigation evidence, in allegation 7 that counsel failed to prepare

adequately for the punishment phase, and in allegation 8 that counsel failed to perform effectively during the punishment phase.[27]

The Court has reviewed the allegations fully in the context of investigation, preparation, and presentation of evidence at trial. To avoid unnecessary duplication, the Court will discuss these four allegations as they relate (1) to Petitioner's alleged mental illness and brain damage and (2) to Petitioner's family history as mitigating evidence.

### 1.    Legal Standards

"Informed strategic decisions of counsel are given a heavy measure of deference and will not be second guessed." *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir.), *cert. denied*, 120 S. Ct. 522 (1999). "Moreover, a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *Id.* (internal quotations and citations omitted). Petitioner's claims are not that trial counsel failed totally to investigate Petitioner's mental health and family history, as indeed the record establishes that such investigation was conducted and family history evidence was presented on Petitioner's behalf

---

[27]    In connection with these claims, Petitioner submitted the declaration of psychologist Faye Sultan. Sultan Declaration, Exh. 57 to Petition. In her declaration, Dr. Sultan states that "within the past week" she reviewed certain records and discussed the case with Ms. Beardsley, Petitioner's habeas counsel. Dr. Sultan does not list the videotapes among the materials she reviewed and admits that she had not reviewed the videotape of the polygraph examination and interview. *Id.* at 4. Nonetheless, Dr. Sultan states that Petitioner "spent much of the interrogation hooked up to a polygraph machine, *looking terrified and confused.*" *Id.* at 3 (emphasis added). It appears, therefore, that much of Dr. Sultan's initial declaration is based on her discussions with habeas counsel rather than on independent analysis. The Court also notes that, although Petitioner (at page 121 of the Petition) and Dr. Sultan (at page 4 of her declaration) indicate that further evaluation resulting in a more comprehensive opinion is forthcoming, no supplemental information from Dr. Sultan has been filed.

during the punishment phase. Petitioner's "argument essentially comes down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999).

### 2.    Alleged Mental Illness and Brain Damage

Petitioner alleges that trial counsel did not fully understand and appreciate Petitioner's mental illness and brain damage and, as a result, rendered constitutionally ineffective assistance at each stage of the proceedings. Petitioner alleges that the "MMPI-II indicates that Mr. Dowthitt may not have been able to assist his attorney in his defense." Petition, at 107. Petitioner also alleges that trial counsel failed to present evidence of Petitioner's "severe mental illness" during the punishment phase[28] and improperly failed to present Dr. Fason, the defense-retained mental health expert.

*State Habeas Court Findings.* -- The state habeas court found that Petitioner "was competent to stand trial." FFCL, at 1131, ¶ 65. The state habeas court also found that "[n]o neuropsychological expert has found that [Petitioner] suffers from brain damage" (*id.*

---

[28]    In support of his allegation that Petitioner's trial counsel was constitutionally ineffective for failing to present evidence of Petitioner's mental illness during the punishment phase, Petitioner submits the Declaration of Dr. Paula Lundberg-Love. Lundberg-Love Declaration [Doc. # 28], Exh. 86 to Petition. Dr. Lundberg-Love states that she would have informed the jury regarding the Post-traumatic Stress Disorder ("PTSD") that Petitioner "was experiencing as a result of witnessing Delton sexually assault Gracie after he had cut her throat and killed her sister prior to Dennis's arrival back at the murder scene." *Id.* at ¶ 18. Dr. Lundberg-Love does not explain why she opines that the PTSD resulted from what Petitioner witnessed and not from what Petitioner was convicted of having committed himself. Additionally, the testimony Dr. Lundberg-Love claims she would have presented to the jury during the punishment phase would have been directly contrary to the jury's prior decision that Petitioner, not Delton, murdered and sexually assaulted Gracie.

at 1127, ¶ 21); and that Petitioner "did not exhibit any symptoms of brain damage" (*id.* at 1131, ¶ 66). The state habeas court also found that Petitioner's medical records "include information which could have hurt [Petitioner's] case." *Id.* at 1131, ¶ 63.

To the extent these are findings of fact or underlying facts in connection with mixed questions of law and fact, they are fully supported by the record and are entitled to a presumption of correctness. To the extent these are decisions on mixed questions of law and fact, the record establishes that they are not an unreasonable application of clearly established federal law to the underlying facts.

*Petitioner's Failure to Reveal Alleged Mental Illness.* -- The record establishes that Petitioner did not inform his trial counsel of any history of mental illness, emotional disorders, or brain damage. Petitioner informed Kelly Hendricks, the polygraph operator, that he had never been treated for any mental or emotional disorder, and that he had never been under the treatment or care of a psychiatrist or psychologist. Videotape, Tape 1 of 3, Exh. 81 to Petition. Even when advised by Hendricks that he could not administer a polygraph examination to anyone who is mentally or emotionally unstable, Petitioner failed to disclose any prior history of mental illness and instead proceeded with the polygraph examination. *Id.*

Notwithstanding Petitioner's steadfast denial of a history of mental illness and the absence of any appearance of mental or emotional disorders, trial counsel in an abundance of caution retained a psychiatrist, Dr. Fred Fason, to examine Petitioner regarding issues of

(

competency to stand trial, sanity at the time of the offense, voluntariness of statements during videotaped interrogation, and future dangerousness.  *See* Fason Report, Exh. 26 to Petition.

*Competency to Stand Trial*. -- Dr. Fason reported that Petitioner had "a rational as well as factual understanding of the charges against him and the consequences if convicted.  He should be able to cooperate and communicate with [counsel] in planning his defense and, therefore, he should be considered competent to stand trial."  *Id*.  Petitioner relies on the opinion of Dr. Lundberg-Love, a psychologist, who reports that Petitioner "may not be able to contribute to his own defense in a legal hearing . . .."  Lundberg-Love Declaration [Doc. # 28], ¶ 13.  The opinion is expressed in the present tense and is the result of testing conducted in January 1999.  Dr. Lundberg-Love expresses no opinion regarding Petitioner's competency to stand trial in 1992.  Trial counsel were not constitutionally ineffective in accepting the report of their retained psychiatrist rather than searching throughout the state for a psychologist who would give a more favorable opinion.

*Trial Counsel's Investigation of Alleged Mental Illness*. -- Petitioner also challenges the extent of trial counsel's investigation into Petitioner's alleged mental illness.  Initially, as noted above, Petitioner maintained that he had never suffered from or been treated for mental illness.  "The evidence of [Petitioner's mental illness] must be considered in tandem with the impressions that he gave the attorneys.  'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . In particular, what investigation decisions are reasonable depends critically on

such information.'" *Boyd v. Johnson*, 167 F.3d 907, 910 (5th Cir.) (citing *Strickland*, 466

U.S. at 691), *cert. denied*, 120 S. Ct. 20 (1999).

Additionally, the mental health records, particularly those related to the Austin State

Hospital commitment resulting from Petitioner molesting an eight-year old niece, clearly

contained information which would be seriously detrimental to Petitioner.[29]  *See* Austin State

Hospital Records, Exh. 7 to Petition.[30]  Although Petitioner complains that trial counsel were

constitutionally ineffective for failing to obtain the past medical records, he concedes that

"some of these records are unavailable to habeas counsel but *may* have been available to trial

counsel in 1992." Petition, at 116 (emphasis added).  Petitioner does not, however, present

evidence that the records were available to trial counsel prior to his trial in 1992.  Petitioner

has not shown that the failure to investigate fully and present evidence of mental illness was

either deficient or prejudicial.

---

[29]    During the polygraph examination procedures, Petitioner mentioned the incident involving his niece, telling Hendricks that the police did not get involved because a friend of the family who was a judge in Humble, Texas, arranged for Petitioner to go to "a hospital in Austin." Videotape, Tape 2 of 3, Exh. 81 to Petition.

[30]    The hospital records contain information that Petitioner "allegedly also molested the same niece when she was five years of age."  Austin State Hospital Records, Exh. 7 to Petition. The hospital records also reflect that "the patient showed a temper and insisted on having his own way."  *Id.*

(

*Alleged Brain Damage*. -- Petitioner also alleges that he suffered from brain damage and that counsel was constitutionally ineffective in failing to investigate.[31]   In support of his allegation that he is brain damaged, Petitioner presents the following evidence:

- he was beaten and "almost killed" while he was in the military;

- he "has a scar on his chin as a result of being swiped in the head by a man wielding a .45 pistol";

- he "was knocked out when a garage door closed upon him";

- he was "rendered unconscious due to a roller-skating accident";

- he "has stitches in his head as a result of a head injury"; and

- following an automobile accident in August 1962, "the patient's E.E.G. showed slight brain damage."

Petition, at 112.

The first five incidents are not evidence of brain damage, only of possible head injuries.  The implications of these injuries have not been established in the record.  The E.E.G. reference is contained only in the Austin State Hospital Admission History under the section titled "Prior Illness."   There is no indication that the reference is based on an examination of other medical records; indeed, the "informant" is listed as a form "filled out by the patient's mother."  Austin State Hospital Records, Exh. 7 to Petition.  This evidence

---

[31]    The record reflects, and Petitioner admits, that the state habeas court authorized $2,500.00 for Petitioner to obtain neuropsychological expert assistance.  This Court also authorized significant funding for other expert assistance.  To date, Petitioner has not presented medical evidence that he has brain damage or that such damage, if any, had an effect on Petitioner relevant to his criminal charges..

does not establish that Petitioner is brain damaged or that trial counsel was constitutionally ineffective for failing to investigate Petitioner's alleged brain damage.

*__Failure to Call Dr. Fason As Witness__*. -- Petitioner complains that trial counsel elected to present evidence on behalf of the defense through cross-examination of Dr. Quijano, the State's expert, rather than through Dr. Fason, the defense's retained expert. This strategic decision appears both well-reasoned and competently executed.

Although Dr. Fason provided both pro and con factors on the issue of future dangerousness, he advised trial counsel unequivocally that he would not testify on this issue. Fason Report, Exh. 26 to Petition. Consequently, trial counsel focused on a strong, effective cross-examination of Dr. Quijano.

Trial counsel obtained a concession that Dr. Quijano's opinion regarding future dangerousness was a "provisional opinion" based on reading records but not examining the defendant. Tr., XXXV:41. Trial counsel obtained testimony from Dr. Quijano that "sexual sadism" is a severe mental disorder. *Id.* at XXXV:50.

Significantly, trial counsel obtained strong evidence from Dr. Quijano on the deliberateness issue by eliciting testimony that "the impulse can be so strong to overwhelm what would be proper to do or not do . . . ." *Id.* at XXV:51. Dr. Quijano similarly testified that "[t]here is a certain point beyond which the behavior is overwhelming, the urge to engage in the behavior is overwhelming." *Id.* at XXV:55. Dr. Quijano testified unequivocally on cross-examination that "[w]hen you cross that line that we are talking about, yes, the ability to control and the responsibility is diminished." *Id.* at XXV:57.

(

Trial counsel elicited testimony regarding the psychiatric services available to capital murder inmates in the Texas Department of Criminal Justice, including a psychiatric team and a sex offender treatment program. *Id.* at XXV:60. Dr. Quijano also testified that Petitioner's potential for future dangerousness is "much less in a controlled setting." *Id.* at XXV:61. Indeed, Dr. Quijano agreed in response to trial counsel's questioning that "in that type of controlled society [life sentence in Texas prison system], the individual would not be exposed to the type of stimulus or stimuli that has in the past caused him to act out and react to this mental disorder that he has." *Id.* at XXV:62.

Dr. Fason had already told counsel that he would not testify regarding the issue of future dangerousness, and his other opinions regarding Petitioner were that he was competent to stand trial, sane at the time of the offense, and admitted his involvement in the murders because of pressure within himself rather than from any undue external influence. Fason Report, Exh. 26 to Petition. Based on this report from the defense expert, trial counsel made a wise strategic decision to elicit favorable testimony from the State's own expert witness. Indeed, Dr. Quijano's testimony on cross-examination could have permitted the jury to answer "no" to the deliberateness question.

Rather than the result of constitutionally ineffective assistance of counsel, the decision to elicit favorable testimony from Dr. Quijano instead of calling Dr. Fason as a witness was an effective strategic decision that will not be second-guessed during a federal habeas proceeding.

### 3.    Family History as Mitigating Evidence

Petitioner alleges that, for purposes of the punishment phase of his trial, defense counsel failed to investigate and present mitigating evidence relating to his family history. Specifically, Petitioner alleges that trial counsel should have called (1) Petitioner's sister Darlene Glover to testify regarding Petitioner's abusive upbringing; (2) Petitioner's son Stacey Dowthitt to testify that he and Petitioner had a strong, loving relationship, and (3) Petitioner's wife, Danna Dowthitt, apparently to testify that she has eight brothers who all knew and loved Petitioner.  Petition, at 117-19.  Petitioner also presents Dr. Lundberg-Love's declaration in support of this claim.[32]

As noted previously, the state habeas court found that Petitioner "did not want any of his family testifying on his behalf."  FFCL, at 1131, ¶ 61.  The state court's finding is entitled to a presumption of correctness, and Petitioner has not rebutted this presumption with clear and convincing evidence.  The Court will nonetheless address Petitioner's specific allegations.

*Darlene Glover*. -- Petitioner complains that trial counsel did not call Darlene Glover as a witness for the defense to testify about Petitioner's abusive upbringing.  The record establishes and the state habeas court found that "Janet Cox testified about [Petitioner's] relationship with his mother and the abuse he suffered as a child."  Tr., XXXVI:112-31; FFCL, at 1131, ¶ 64.

---

[32]    Dr. Lundberg-Love states in conclusory fashion that "[h]ad a mental health professional *with my expertise, background and experience* been consulted at the trial level of Dennis Dowthitt's case, Dennis's attorneys would have been able to present a strong mitigation case to the jury.  Lundberg-Love Declaration, at ¶ 18 (emphasis added).

(

The Court finds that it is neither deficient performance nor prejudicial to present evidence through a non-family witness with first-hand knowledge of Petitioner's abusive childhood rather than through a family member.

***Stacey Dowthitt and Danna Taft.*** -- Petitioner argues that Stacey Dowthitt should have been called to testify regarding his loving relationship with Petitioner and that Danna Taft should have been called to testify that her brothers loved Petitioner. The proffered evidence is of limited probative value. The decision not to present this testimony was not constitutionally deficient or prejudicial. The love one or more children had for their father is not necessarily relevant to that father's relationship with a different child, particularly in light of other trial testimony that (1) Petitioner had induced one son to commit murder (Tr., XXIX:414); (2) Petitioner had tried to spread one daughter's legs apart when she was four or five years old (*id.* at XXXV:2); and (3) Petitioner had sodomized another daughter with a bottle and a broomstick (*id.* at XXXV:8).[33]

### 3.  Conclusion

Petitioner has not established that trial counsel's investigation, preparation, or presentation of evidence regarding his alleged mental illness or his family history as potentially mitigating evidence was either constitutionally deficient or prejudicial. The Court denies Petitioner's request for habeas relief based on these allegations.

---

[33]  Dr. Lundberg-Love states her belief that Darla may think her father sodomized her when it was really someone else. Lundberg-Love Declaration, at ¶ 9. This opinion is nothing but pure speculation. It is farfetched that a girl would mistakenly think that her father is sodomizing her with a bottle and a broomstick when it is actually someone else.

## G.   Alleged Failure to Prepare Fully for Suppression Hearing

Petitioner alleges that trial counsel was constitutionally ineffective "by failing to prepare and present a thorough hearing on the suppression of Mr. Dowthitt's statement." Petition, at 121.  Petitioner is correct that "had trial counsel established at the suppression hearing that Mr. Dowthitt was in custody *before* he made this statement ("I was there the whole time"), the jury would not have been given this damaging piece of evidence." *Id.* at 122.

Petitioner testified at the suppression hearing and, based in part on his testimony, the trial court denied the motion to suppress.  Petitioner now argues that his ex-wife and son could have presented during the suppression hearing evidence intending to indicate *they believed* Petitioner was in custody before giving his statement.  This evidence is presented for the first time in this proceeding and inexplicably was not presented to the state habeas court.  As discussed in the subsequent section regarding the admission of Petitioner's statement into evidence, statements by Petitioner's ex-wife and son are not relevant to the custody issue.

The trial court, the Texas Court of Criminal Appeals, and this Court have concluded that Petitioner was not in custody at the time he gave the statement "I was there the whole time."  Trial counsel was not constitutionally ineffective for failing to obtain a different result.

(

## H.    Allegedly Inadequate Closing Arguments

Petitioner alleges that defense counsel gave an inadequate closing argument both at the guilt/innocence phase and at the punishment phase. Petition, at 124. Petitioner states that counsel's arguments "evidenced an attitude of hopelessness and inability or unwillingness to advocate on Mr. Dowthitt's behalf." *Id.*[34] The state habeas court found that "trial counsel were zealous advocates for [Petitioner's] defense during closing arguments." FFCL, at 1132, ¶ 81.

This Court has reviewed the closing arguments presented on Petitioner's behalf at both the guilt/innocence phase and the punishment phase. The record supports the state habeas court's finding. Trial counsel's closing arguments were clearly adequate to satisfy the requirements of the United States Constitution.

## I.    Alleged Failure to Present "The Reasons Mr. Dowthitt Said 'I Was There the Whole Time'"

Petitioner alleges that trial counsel "failed to bring to the jury's attention the true character and circumstances" of the statement "I was there the whole time." Petition, at 125. The Court notes that, as of the February 11, 1999 filing of the Petition, Petitioner apparently had not yet decided on the "true character and circumstances" of the statement. In the Petition, the statement is represented to be the result of confusion, *or* to be mere "mimicking,

---

[34]    Petitioner also states that counsel "misstated the facts" regarding the results of the DNA testing when he stated that the blood on the beer bottle was "95% certain to be Gracie's." Viewed in the context of the evidence presented at trial, the statement was a reasonable characterization of the DNA evidence that Gracie was one of the 5% group remaining after 95% of the relevant population was excluded. Counsel's acceptance of the uncontradicted evidence was a proper effort to bolster his credibility with the jury. *See, e.g., Kitchens v. Johnson,* 190 F.3d 698, 704 (5th Cir. 1999).

(

*or* sarcasm and disbelief." Petition, at 152 (emphasis added). Shortly after the statement was made, however, Petitioner believed that he had "convicted" himself with the statement. *See Dowthitt*, 931 S.W.2d 244, 253 (Tex. Crim. App. 1996). Counsel is not constitutionally ineffective for failing to anticipate each of the alternative explanations for the statement which might later be asserted by Petitioner or his habeas counsel.

## J.    Conclusion

Based on the foregoing, Petitioner has not established either deficient performance by his trial counsel or prejudice resulting from any alleged deficiencies. The record clearly shows that defense counsel presented a zealous defense on Petitioner's behalf, particularly when faced with credible, corroborated accomplice witness testimony. Defense counsel forced the prosecution to submit their case against Petitioner to "the crucible of meaningful adversarial testing" as required by the Sixth Amendment.[35] Defense counsel's strategic choices were carefully considered and well-reasoned. Petitioner received competent representation which, though perhaps not perfect, fell substantially short of "constitutionally ineffective." The Court, without reservation, denies Petitioner's claim for habeas relief based on allegedly ineffective assistance of counsel.

---

[35]    The state habeas court found that "trial counsel were relentless in the defense of their client in the face of a very bad set of facts." FFCL, at 1132, ¶ 80. The finding is fully supported by the record and, as a mixed question of law and fact, is not an unreasonable application of clearly established federal law.

(

## III. PETITIONER'S RIGHT TO DUE PROCESS AND A FUNDAMENTALLY FAIR TRIAL WAS VIOLATED BY PROCEDURES EMPLOYED BY THE STATE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS

Petitioner alleges that his constitutional rights were violated by the following conduct by the State:

- failing to disclose that the blood scrapings originated on a knife and not on the beer bottle;

- misrepresenting evidence to suggest falsely that Petitioner admitted that he was present during the murders;

- misrepresenting the conclusiveness of DNA evidence;

- failing to disclose that Darla was under felony indictment;

- employing improper investigative procedures; and

- engaging in general misconduct.

Petitioner has failed to satisfy the applicable legal standards for relief based on his claim of State misconduct.

### A.   Alleged Failure to Disclose "True Origin" of Blood Scrapings

Petitioner alleges that the State failed to disclose "that the scrapings used at trial to connect a beer bottle with Mr. Dowthitt's fingerprint on it to the victim's DNA, were actually taken from a knife, not from the bottle." Petition, at 148 (citations to exhibit numbers omitted). In support of this argument, Petitioner relies on an evidence label which has on it the typewritten words "scrapings from lock blade knife" crossed out and replaced with the handwritten words "from bottle." Photograph, Exh. 70 to Petition. Petitioner argues that this failure violated his due process rights under *Brady v. Maryland*, 373 U.S. 83

(

(1963), and his rights to effective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984).

The state habeas court found that the "label shown in Exhibit 3 of [Petitioner's] supplemental application, "scrapings from lock blade knife," was in error." FFCL, at 1132, ¶ 86. The state habeas court further found that "no bloody knife or knife 'covered with blood' was recovered in this case." *Id.* at 1129, ¶ 39. The state court found that "no blood scrapings other than those from a beer bottle recovered from [Petitioner's] shop were submitted for testing." *Id.* at 1129, ¶ 40. The state habeas court also found that "only scrapings from a bottle, and not from a knife, were submitted for DNA testing." *Id.* at 1132, ¶ 87.

Petitioner is not entitled to federal habeas relief on this claim unless the state court's findings were unreasonable "in light of the evidence presented in the State court proceeding." *See Kitchens*, 190 F.3d at 700. This Court has reviewed the record and concludes that the state habeas court's findings are fully supported by the record. The findings are supported by the affidavits of Detective Frank Hidalgo, Sheriff's Deputy Buster Emmons, and DNA forensic analyst Judy Floyd.

Petitioner's only evidence on the issue is the altered label, which the state habeas court found was explained by Deputy Emmons. Petitioner also submits a "Chain of Custody" form on which the "sample description" is "scrapings from lock blade knife." Chain of Custody Form, Exh. 20 to Petition. The description on the form, however, is corrected to reflect "actually from <u>bottle</u>." *Id.* (emphasis on original).

(

The state habeas court's findings are "presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Petitioner has not satisfied this burden and has not established that the state court's findings were unreasonable. The Court denies Petitioner's request for relief on this issue.

### B. Alleged Misrepresentation of Petitioner's Admitted Presence

In addition to his claim that his oral and written statements should not have been admitted into evidence in any manner (Claim IV herein), Petitioner also claims that the statements were improperly admitted through Hidalgo's oral testimony. Petitioner alleges that he made the statement "I was there the whole time" with "oral inflection" indicating "confusion, mimicking, or sarcasm and disbelief." Petition, at 152. Petitioner argues that the presentation of this statement through Hidalgo's testimony failed to present this "oral inflection" to the jury. *Id.*

Petitioner at trial objected to the presentation of the videotape of the interview because the polygraph machine was clearly visible on the tape. As noted by the Texas Court of Criminal Appeals on direct appeal, Petitioner offered no alternative method of presenting the statement. *See Dowthitt*, 931 S.W.2d at 263. The Court has reviewed the relevant portion of the videotape and does not agree with Petitioner's characterization of his statement as "laden with confusion, mimicking, or sarcasm and disbelief." Presentation of the evidence in a manner that does not present Petitioner's alleged "oral inflection" to the jury does not provide a basis for federal habeas relief.

(

## C.    Alleged Misrepresentation of DNA Evidence

Petitioner alleges that the State in closing argument misrepresented the DNA evidence by stating, "You know that it is Gracie's blood on that beer bottle . . .." Petition, at 153. Petitioner characterizes this statement as argument that the "DNA evidence was conclusive proof that the blood on the bottle was the victim's." *Id.*

To prevail on his claim that an improper argument by the prosecutor violated his constitutional rights, the remarks by the prosecutor must have been so prejudicial that they rendered the trial fundamentally unfair. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 641 (1974). It is not improper closing argument for the prosecutor to tell the jury the inferences and conclusions that she wants them to draw from the evidence "so long as those inferences are grounded upon evidence." *See United States v. Munoz*, 150 F.3d 401, 414-15 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 887 (1999).

The DNA evidence presented in this case established that Gracie was among a group consisting of only 5% of the relevant population who could have contributed the blood from the bottle. The prosecutor did not argue that the DNA testing was conclusive. The prosecutor's statement that the jury "know[s] that it is Gracie's blood on that beer bottle" is a statement of a reasonable conclusion the jury could draw from the evidence presented at trial. The prosecutor's statement was within the ambit of fair argument from the evidence. The statement was not a misrepresentation of the evidence, and Petitioner is not entitled to federal habeas relief based on this claim.

(

### D.   Failure to Disclose That Darla Was Under Felony Indictment

As found by the state habeas court, "at the time she testified, Darla Dowthitt was under indictment for indecency with a child and this fact was elicited at the punishment phase before the jury." FFCL, at 1131, ¶ 70.  Petitioner argues that the prosecutor's failure to disclose the existence of the indictment against Darla violated the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963).  Petition, at 153.  Petitioner suggests that "it is very likely that an oral 'deal' was struck delaying Darla's plea bargain until after her testimony." Petition, at 154.

The state habeas court found that the "prosecutors did not offer Darla a deal for her testimony and did not reset her case to avoid a felony conviction for impeachment purposes." FFCL, at 1134, ¶ 8.  This finding is entitled to a presumption of correctness which can be overcome only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Petitioner has presented no evidence to support his position that Darla had an oral "deal" with the prosecution which should have been disclosed.[36]  The record contains significant evidence, on the other hand, to support the state habeas court's finding.  Darla testified that she did not know why her trial had been delayed; that she thought it was delayed to follow Petitioner's trial, but only because it was scheduled to a date after Petitioner's trial; and that no one had told her that her trial had been delayed for any reason relating to Petitioner's trial.  Tr., at XXXVI:95.

---

[36]   The Court notes that the existence of an indictment, as opposed to a conviction, is not generally admissible to impeach.  *See Vega v. Johnson*, 149 F.3d 354, 363 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 899 (1999).

(

Petitioner argues that the proper inquiry is not whether there is a deal, "but the witness' belief or disbelief that a deal exists." Petition, at 156 (quoting from *United States v. Onori*, 535 F.2d 938, 945 (5th Cir. 1976)). Darla testified, however, that there was no plea agreement and that she would not enter into a plea agreement with the government because she was "not guilty." *Id.* at XXXVI:100. This testimony makes it clear that Darla did not believe that a plea agreement existed in connection with her indictment.

The state habeas court's finding is fully supported by the record. Petitioner has presented no evidence to support his claim that Darla had a "deal" with the government which should have been disclosed to the defense. The Court denies Petitioner's claim for habeas relief based on this claim.

### E.   Allegedly Improper Investigative Procedures

Petitioner argues that his due process rights were violated by the use of improper investigative procedures. Petition, at 157. Specifically, Petitioner alleges that (1) Hidalgo intentionally elicited untruthful statements from Delton; (2) state law enforcement officers intimidated a defense witness; and (3) the State carelessly handled the beer bottle used to sodomize Gracie Purnhagen.

### 1.   Legal Standard

The United States Supreme Court has recognized that outrageous misconduct by law enforcement officials can rise to the level of a due process violation. *See Rochin v. California*, 342 U.S. 165, 169 (1952). To rise to the level of a due process violation, the misbehavior must "so shock[] the sensibilities of civilized society as to warrant a federal

(

intrusion into the criminal processes of the States." *See Moran v. Burbine*, 475 U.S. 412,

433-34 (1986). "[T]he judiciary is extremely hesitant to find law enforcement conduct so

offensive that it violates the Due Process Clause." *United States v. Voigt*, 89 F.3d 1050,

1065 (3d Cir.), *cert. denied*, 519 U.S. 1047 (1996).[37]

## 2. Interrogation Techniques

Petitioner claims that Hidalgo intentionally elicited untruthful statements from Delton.

Petition, at 158. Petitioner also claims that Hidalgo improperly used the "kinesic"

interrogation technique on Petitioner, "subjecting him to hours of intensive pressure" in an

attempt to elicit a statement "without regard to the truth of its details." *Id.* at 159. Petitioner

argues this improper interrogation method violated his due process rights because it resulted

in the State presenting false testimony and failing to correct false testimony. *Id.* (citing

*Alcorta v. Texas*, 355 U.S. 28 (1957) and *Napue v. Illinois*, 360 U.S. 264 (1959)).

***Explanation of the Kinesic Method.*** -- Hidalgo described the "kinesic"

interrogation technique during his trial testimony. According to Hidalgo's testimony, the

technique is a fairly common interview method that "makes available the aspects of personal

space and a type of questioning that puts the interviewee in a position of being stressed so

that evaluations can be made as to his truthfulness and then coming to a basis of a conclusion

as to whether he is telling the truth or not . . .." Tr., at XXX:618. Hidalgo also identified

an aspect of the technique: "when an interviewee is reluctant to explain or finds it difficult

---

[37] "Although litigants continue to assert the doctrine as a defense against conviction, 'courts have rejected its application with almost monotonous regularity.'" *Id.* (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993) (collecting cases)).

explaining what he did and why he did it, you offer doors or offer explanations to the interviewee for him to be able to rationalize and minimize his involvement in whatever it is we're questioning him about." *Id.* at XXX:619.

*Delton's Adoption of Hidalgo's Suggestions.* -- The record reflects that Delton, in making his initial statement, said that Gracie was upset, that Gracie was pregnant by someone else, and that Gracie was leaving and Delton was upset about it. *Id.* at XXX:619-20. Hidalgo testified that he suggested those situations to Delton as possible reasons for his having killed Gracie as "a way for him to minimize and rationalize what we believed he had done." *Id.* at XXX:620. Hidalgo testified that there was no factual basis for the suggested reasons, and Hidalgo was concerned that Delton "would grab on to just about anything that I would throw out to him and then agree with me and then that formed the basis of the statement that he gave later." *Id.* at XXX:620-21.

Petitioner's argument that this establishes that the State presented false testimony or failed to correct false testimony is refuted by the record. The State did not present Delton's original statement, in which he said he killed both girls, as a true statement. There is no indication in the record that Hidalgo's testimony regarding his interview with Delton was in any way false.

*No Due Process Violation.* -- Petitioner's argument that his interview, in which the kinesic technique was used, was a violation of due process is also without merit. The Court has reviewed the videotape of the interrogation and concludes that the use of the technique falls short of police misconduct which "shocks the sensibilities of civilized

(

society." Petitioner has not established a due process violation based on the interrogations of himself or of Delton.

### 3.    Alleged Intimidation of Defense Witness

Petitioner alleges that state investigators intimidated a defense witness, David Tipps, who then declined to testify even when the trial court threatened to hold him in contempt. Petition, at 159. The allegation was made to the trial court during the guilt/innocence phase of Petitioner's trial. An investigator for the defense, Omar Leon Ringo, testified outside the presence of the jury at trial that he talked to Tipps in the jail in July 1991. Tr., at XXXIII:1182. During that conversation, Tipps allegedly told Ringo that Delton had told Tipps that he (Delton) "had killed his girlfriend and her sister . . .." *Id.* at XXXIII:1079. When Tipps exercised his Fifth Amendment rights and refused to testify, the Court correctly excluded from evidence the written statement allegedly given by Tipps to Ringo.

Petitioner raised the alleged intimidation of Tipps as an issue on direct appeal, asserting a due process violation. The Texas Court of Criminal Appeals overruled the points of error relating to Tipps. *See Dowthitt*, 931 S.W.2d at 267. The appellate court noted that Hidalgo and an investigator for the prosecutor's office visited Tipps in jail, introduced themselves, and told them they were investigating the Dowthitt case. *Id.* at 265. The appellate court also found that the investigator mentioned perjury, but told Tipps "that if he were telling the truth, there was no problem." *Id.* The record, as discussed by the appellate court, also reflected that Tipps was "afraid of being labeled a 'snitch.'" *Id.*

(

The Texas Court of Criminal Appeals decided that Tipps's concern with being considered a snitch was a more accurate explanation for his refusal to testify and that the alleged intimidation of Tipps did not establish a due process violation. The Texas Court of Criminal Appeals' decision is neither contrary to nor an unreasonable application of Supreme Court authority. The factual findings on which that decision rests are well supported by the evidence presented at trial. Petitioner's claim that he was denied due process based on the alleged intimidation of Tipps lacks merit and is denied.

### 4.   Careless Handling of the Beer Bottle

Petitioner also challenges as a due process violation the careless handling of the beer bottle with which Gracie Purnhagen was sodomized. Petitioner argues that "testing should have been done for latent prints matching Delton Dowthitt and not Mr. Dowthitt." Petition, at 164. Petitioner also alleges that there was "no evidence presented demonstrating that Mr. Dowthitt and Delton were excluded as being possible donors of the blood." *Id.* at 165.

With reference to the allegation that fingerprint testing should have been conducted as to Delton but not as to Petitioner, the Court finds that including Petitioner in the State's fingerprint analysis is clearly not misconduct which shocks the sensibilities of a civilized society.

With reference to the allegation that Delton and Petitioner were not excluded as contributors of the blood, the state habeas court specifically found that "Delton Dowthitt and [Petitioner] are excluded as contributors of the blood on the beer bottle recovered from [Petitioner's] shop." FFCL, at 1129, ¶ 37. Petitioner presents no evidence, clear and

convincing or otherwise, to overcome the presumption of correctness to which this finding is entitled.[38] Additionally, the Court notes that Petitioner was given generous funding for DNA testing in this federal habeas proceeding, but he has not presented the Court with evidence of any favorable results. The Court denies Petitioner's claim based on the handling and testing of the beer bottle.

### F. Alleged "General Misconduct"

Petitioner alleges a due process violation based on "general misconduct" by the prosecution including allegedly mishandling evidence, failing to keep the file organized in a manner acceptable to Petitioner, failing to maintain a proper chain of custody resulting in missing evidence, and failing to conduct certain testing.

#### 1. Allegations Are Conclusory

Most of the allegations regarding "general misconduct" are conclusory. For example, Petitioner alleges that his "forensic evidence expert viewed many pieces of evidence that the state had never tested." Petition, at 169. These "pieces of evidence" are, for the most part, not identified.[39] Petitioner alleges that there "are many photographs, audio cassettes, and videos, that *may or may not* have been shown to trial counsel, appellate counsel or habeas counsel." *Id.* (emphasis added). Such conclusory allegations do not support a claim for

---

[38]    Indeed, as noted previously, Petitioner concedes that "state habeas counsel's DNA tests established that Delton Dowthitt and [Petitioner] were both eliminated as contributors of the blood contained in the 'scrapings.'" Petition, at 53.

[39]    Petitioner alleges that the State improperly failed to test Gracie Purnhagen's clothing for "blood, DNA, etc. to reveal whose blood was on the items." Petition, at 169. There is no evidence in the record to suggest that Delton or Petitioner bled at the murder scene, and Petitioner does not explain why he believes Delton's blood might have been on Gracie's clothes.

habeas relief. *See Miller v. Johnson*, ___ F.3d ___, 2000 WL 4950 *6 (5th Cir. Jan. 5, 2000) (conclusory allegations regarding ineffective assistance of counsel are inadequate).

### 2.      No Due Process Violation

None of the alleged "general misconduct" rises to the level of a due process violation.

*Allegedly "Missing" Evidence*. -- Petitioner states that certain evidence envelopes are now empty. The state habeas court found that "the blood scrapings from a bottle, a liver sample from Gracie Purnhagen, a spleen sample from Tiffany, and the Miller Genuine Draft longneck bottle with blood on it found at [Petitioner's] auto shop were admitted in evidence." FFCL, at 1133, ¶ 92. The state habeas court further found that "the chain of custody evidence bags relating to evidence admitted at trial were re-stored in the State's files, empty." *Id.* at 1133, ¶ 91. These findings are supported by the record, and there is no evidence to overcome the presumption of correctness to which they are entitled.

*Disorganized Files and Failure to Conduct Tests*. -- Petitioner cites no legal authority for his argument that due process requires that a chain of custody and a neatly-organized file be maintained by the State after final conviction. Instead, United States Supreme Court authority establishes that even the destruction of potentially exculpatory evidence does not violate the defendant's constitutional rights unless the destroying officials acted in bad faith by failing to preserve the evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Similarly, "the police do not have a constitutional duty to perform any particular tests" and an alleged failure to test certain items does not rise to the level of a due process violation

CM/PDF - www.lexisn.com

unless there is a showing of bad faith. *Id.* at 58-59. Petitioner's allegations do not raise even a hint of bad faith on the part of the prosecutors or the law enforcement officers in his case.

### 3.    Conclusion as to Alleged "General Misconduct"

The Court denies Petitioner's request for habeas relief based on alleged "general misconduct." His allegations do not rise to the level of a due process violation.

### G.    <u>Conclusion</u>

Petitioner's "state misconduct" claims relating to the origin of the blood scrapings which were subjected to DNA analysis, the presentation of Petitioner's statements from the police interview, and the prosecutor's closing argument regarding the results of the DNA analysis are refuted by specific factual findings made by the state courts which are fully supported by the record. Petitioner's "state misconduct" claims regarding Darla's felony indictment, investigative techniques used by law enforcement officials, and "general misconduct" do not rise to the level of a constitutional violation in light of the evidence in the record and the state courts' findings. As a result, the Court denies Petitioner's claim based on alleged State misconduct.

### IV.    <u>PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE ADMISSION OF HIS ORAL AND WRITTEN STATEMENTS</u>

Petitioner's fourth claim is that his constitutional rights were violated by the admission of his oral and written statements.[40] Petitioner argues that (1) he was in custody

---

[40]    The opinion of the Texas Court of Criminal Appeals on direct appeal of Petitioner's conviction fully and accurately set forth the factual background surrounding Petitioner's oral and written statements. *Dowthitt v. State*, 931 S.W.2d 244, 252-254 (Tex. Crim. App. 1996).
(continued...)

from the moment he initially refused to take the polygraph test, (2) the statements were procured after assertion of his right to remain silent, (3) he did not make the statements voluntarily, and (4) he did not knowingly, intelligently and voluntarily waive his rights to remain silent or to have counsel present.

## A.     <u>Prior Consideration of Issues by State Courts</u>

### 1.     Motion to Suppress

Petitioner's challenge to the admission of his oral and written statements was first presented to the trial court through a motion to suppress. Following the trial court's review of the videotaped interview and testimony presented during an evidentiary hearing prior to trial, the trial court found that the "written statement taken by Officer Hidalgo was made under voluntary conditions . . .." Tr., XXV:186. The trial court found that the statement was "voluntarily made by the Defendant after having been duly warned by Kelly Hendricks . . .." *Id.* at XXV:187.

---

[40]     (...continued)

Briefly, Petitioner appeared voluntarily at the sheriff's office at 9:00 a.m. on June 20, 1990 and gave a written statement. At 11:00 a.m., Petitioner left to go to lunch. At 1:00 p.m., Petitioner returned voluntarily to the sheriff's office and asked to change his prior written statement to delete a false alibi. Petitioner was questioned by Hidalgo until approximately 6:00 p.m. when Petitioner signed a second written statement. Petitioner agreed to take a polygraph examination, which began at approximately 7:00 p.m. Prior to the start of the polygraph examination, which was recorded on videotape, Petitioner was advised of his *Miranda* rights. The polygraph examination lasted until approximately 11:00 p.m. and reflected that Petitioner had not told the complete truth. Hidalgo then resumed questioning Petitioner. At approximately 1:00 a.m. the following morning, Petitioner stated, "I was there the whole time." Petitioner did not admit that he participated in the murders, but he later stated, "I have already convicted myself now, and it doesn't really matter." Petitioner's statement regarding having convicted himself was not presented to the jury. After the interview, Petitioner signed a third written statement at approximately 3:55 a.m.

(

With reference to the oral statements, the trial court found the statements were voluntary. *Id.*

On the issue of custody, the trial court found that Hidalgo "subjectively determined" that Petitioner would not be allowed to leave after Petitioner stated that he was at the murder scene the whole time. *Id.* at XXV:188. The trial court further found that Petitioner was probably not "of the same impression" and "probably didn't realize he was under arrest until he was told after the confession was made." *Id.*

### 2.   Direct Appeal

Petitioner next presented this claim on direct appeal. The Texas Court of Criminal Appeals engaged in a lengthy analysis of the facts and legal principles. *See Dowthitt*, 931 S.W.2d at 252-263. Based on this thorough analysis, the Texas Court of Criminal Appeals concluded that Petitioner was in custody beginning "after [Petitioner] admitted to his presence during the murders." *Id.* at 257. The Texas Court of Criminal Appeals also concluded that Petitioner was given warnings regarding his constitutional rights which were "both constitutionally and statutorily adequate." *Id.* at 259. The appellate court held that Petitioner's "invocation of his right to remain silent was ambiguous, and Hidalgo did not violate [Petitioner's] rights by continuing the interrogation." *Id.* at 257. As a final matter, the Texas Court of Criminal Appeals held that any "error in the admission of [Petitioner's] statements into evidence . . . would be harmless beyond a reasonable doubt." *Id.* at 263 (citing *Chapman v. California*, 386 U.S. 18 (1967)).

### 3.    State Habeas Application

Petitioner presented this claim to the state habeas court in his state application for habeas relief.  The state habeas court found that the claim was raised on direct appeal and that Petitioner presented "no new authorities to show that he is entitled to a second review of the admissibility of his oral and written statements."  FFCL, at 1128, ¶¶ 28-29.  The state habeas court also found that Petitioner "never refused to answer any more questions nor asked to leave."  *Id.* at 1129, ¶ 41.  Citing *Colorado v. Connelly*, 479 U.S. 157 (1986), the state habeas court concluded that Petitioner's "mental state in giving his statements is not relevant to due process."  *Id.* at 1134, ¶ 7.

### B.    Analysis of Challenges Presented in Federal Habeas Petition

### 1.    Custody Issue

Petitioner argues that he was in custody shortly after he returned to the sheriff's office after lunch.  As noted above, the state trial court and the state appellate court have previously determined that Petitioner was not "in custody" until, at the earliest, he made the statement "I was there the whole time."

*Legal Standard.* -- "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *Stansbury v. California*, 511 U.S. 318, 323 (1994).[41]  The Supreme Court in *Stansbury* noted that an individual is not

---

[41]    Petitioner attempts to support his custody argument with his ex-wife's affidavit, which was not presented to the trial court in connection with the motion to suppress or to the state appellate or habeas courts.  *See* Affidavit of Danna Taft, Exh. 54 to Petition.  In the affidavit,
(continued...)

(

necessarily in custody for purposes of receiving *Miranda* warnings even though the individual may be the focus of the investigation. *Id.* (citing *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976)). "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Id.* at 325. The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Id.* at 324 (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

*Petitioner's Testimony.* -- Petitioner testified at the evidentiary hearing prior to his trial that he "didn't feel like [he] could" leave the sheriff's office, but that he did not "know what specifically gave [him] the impression." Tr., at XXV:151. Petitioner later stated that the impression arose "mainly" from "the fact of where [he was]."[42] *Id.* at XXV:154-55. As a final explanation of his belief that he was not free to leave, Petitioner states that the officers "didn't say, 'Okay, go ahead,' when I *implied* that I wanted to, they didn't say leave." *Id.* at XXV:180 (emphasis added).

---

[41]   (...continued)
Ms. Taft states that she thought that an officer's statement that Ms. Taft and her family would have to wait longer to visit Petitioner's son "was an excuse to make us stay down there, and to keep [Petitioner] from leaving." *Id.* at ¶ 8. Regardless of whether the affidavit is properly considered by this Court, Ms. Taft's subjective interpretation of statements regarding a delayed visit with Petitioner's son is not relevant to the custody issue.

[42]   Questioning of an individual at a police station is not necessarily custodial. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

(

*Conclusion*. -- The state appellate court concluded that Petitioner was not in custody until, at the earliest, after he stated that he was at the murder scene the whole time.[43] Based on the circumstances described by Petitioner, as well as review of the other matters of record in this proceeding, this Court concludes that the state appellate court's decision was not an unreasonable application of clearly established Supreme Court authority.  The Court denies Petitioner's request for federal habeas relief based on his claim that he was in custody at the time he gave his oral statement.

**2.      Continued Questioning After Assertion of Right to Remain Silent**

Petitioner alleges that his assertion of his right to remain silent was not "scrupulously honored."  Petition, at 179 (citing *Michigan v. Mosely*, 423 U.S. 96, 104 (1975)).  An individual's assertion of his constitutional rights must be unequivocal.  *See Davis v. United States*, 512 U.S. 452 (1994) (right to counsel); *see also Barnes v. Johnson*, 160 F.3d 218, 225 n.2 (5th Cir. 1998) (state court's decision to admit statement over claim that defendant asserted right to remain silent was not contrary to Supreme Court authority), *cert. denied*,

---

[43]     Petitioner argues in his Response that even if he was not in custody until after he stated he was there the whole time, his subsequent statements regarding having sex with his daughter were inadmissible.  Response, at 46.  On this basis, Petitioner challenges the incest evidence presented during the punishment phase.  The state appellate court held that the *Miranda* warnings given prior to the polygraph examination were proper and covered the interrogation by Hidalgo.  *Dowthitt*, 931 S.W.2d at 257-58.  The state appellate court adopted the trial court's finding, made in connection with the motion to suppress, that the polygraph examination and Hidalgo's questioning was "a single, continuous interrogation." *Id.* at 258 n.6.  As a result, the statements regarding Petitioner having sex with his daughter were made after Petitioner was advised of his constitutional rights and waived them.  "[S]tatements made by a defendant during custodial interrogation are not rendered inadmissible simply because the police failed to repeat Miranda warnings previously given to the defendant when he was not in custody." *People of Territory of Guam v. Dela Pena*, 72 F.3d 767, 769 (9th Cir. 1995).

119 S. Ct. 1768 (1999). It is insufficient "that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking" his constitutional rights. *Davis*, 512 U.S. at 459. Indeed, the Supreme Court stated that the interrogating officers are not required to ask "clarifying questions." *Id.* at 461.

During the evidentiary hearing on Petitioner's motion to suppress, Petitioner testified that he asked Hidalgo in one way or another to stop the interrogation, but he "wasn't getting through to him." Tr., at XXV:156. Petitioner conceded that he did not tell anyone (1) that he wanted a lawyer, (2) that he did not want to talk to the officers anymore, or (3) that he wanted to leave. *Id.* at XXV:178.

Based on this testimony, as well as review of the videotaped interview, the state habeas court found that Petitioner "never refused to answer any more questions nor asked to leave."[44] FFCL, at 1129, ¶ 41. The state court's finding on this subsidiary fact is conclusive on habeas review because it is fully supported by the record. *See Muniz v. Johnson*, 132 F.3d 214, 219 (5th Cir. 1998).

---

[44] Petitioner's best support for his allegation that he invoked his constitutional rights is his statement during the interview that he did not "want to do nothing else right now." Videotape, Tape 3 of 3, Exh. 81 to Petition. Taken in context, however, the statement was not an unequivocal invocation of Petitioner's right to remain silent. Hidalgo had just reminded Petitioner that he had "found out the hard way that you can't fool this [polygraph] machine." When Hidalgo asked, "if Kelly [Hendricks] was to come back here and ask you . . .", Petitioner responded, "I don't want to do nothing else right now" and pointedly looked away from the polygraph machine. When Hidalgo rephrased his question to "If someone was to ask you now . . .," Petitioner continued to answer questions. *Id.* Petitioner's statement fell significantly short of an unambiguous invocation of his right to remain silent, and was reasonably interpreted by Hidalgo as a statement that Petitioner did not want "nothing else to do with that polygraph." *See* Tr., XXV:54.

(

Petitioner did not unequivocally invoke his rights to remain silent or to counsel.  As a result, Petitioner's argument that his assertion of his constitutional rights was not "scrupulously honored" cannot provide the basis for federal habeas relief.

### 3.    Voluntariness of Statements

Petitioner argues that his statements were not voluntary because they were the result of improper law enforcement techniques and Petitioner's mental illness.  Petition, at 188. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."  *Colorado v. Connelly*, 479 U.S. 157, 165 (1986).  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.  *Id.* at 167; *see also Jones v. Johnson*, 171 F.3d 270, 278 (5th Cir.), *cert. denied*, 120 S. Ct. 29 (1999).  Similarly, the "Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'"  *Id.* at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

In this case, Petitioner's arguments regarding alleged police coercion are contradicted by the videotapes and by Petitioner's own testimony at the evidentiary hearing.  Petitioner described Hidalgo's interrogation manner as "professional" but Petitioner "knew that [Hidalgo] was trying to get something out of [Petitioner]."  Tr., XXV:158.  Petitioner testified that Hidalgo was forceful, but "[i]n a nice way."  *Id.* at XXV:162.  This Court's review of Petitioner's testimony and the videotaped interrogation does not reveal that

Petitioner was "worn down by improper interrogation tactics or lengthy questioning[45] or by trickery or deceit . . .  The officers did not intimidate or threaten [Petitioner] in any way. Their questioning was . . . free from the abuses that so concerned the Court in *Miranda*." *See Fare v. Michael C.*, 442 U.S. 707, 726-27 (1979).

Absent government coercion, Petitioner's constitutional rights under the Fifth and Fourteenth Amendments were not violated.  The state habeas court's decision, citing *Colorado v. Connelly*, that Petitioner's "mental state in giving his statement is not relevant to due process" is neither contrary to nor an unreasonable application of Supreme Court authority.

### 4.    Waiver Issue

Petitioner argues that he did not knowingly, intelligently, and voluntarily waive his rights to remain silent or to have counsel present.  Petition, at 193.  Petitioner argues that he was not adequately advised of his constitutional rights because the person who advised him of his constitutional rights "was not even in uniform" and covered the warnings quickly.  *Id.* at 193-94.  The Texas Court of Criminal Appeals held that Hendricks, the non-uniformed polygraph operator, "gave the proper warnings before conducting the polygraph examination."  *Dowthitt*, 931 S.W.2d at 257.  The appellate court's finding is clearly supported by the record.  Petitioner was given the proper warnings, signed to acknowledge

---

[45]    The polygraph examination and interrogation was videotaped.  Three videotapes were presented to the Court as Exhibit 81 to the Petition.  The first two videotapes are exclusively from the period during which the polygraph examination was administered.  Review of these videotapes shows that during much of that time period Petitioner was in the room alone and no questioning was taking place.  Videotapes 1 and 2 of 3, Exh. 81 to Petition.

(

that he understood the rights, and failed to exercise unequivocally the rights explained to him.[46]  Petitioner's waiver claim is without merit.

### C.    Conclusion

The state courts determined that Petitioner was not in custody until, at the earliest, after he made the "I was there the whole time" statement.  The state courts also determined that Petitioner was properly advised of his constitutional rights and that he did not unequivocally invoke his right to remain silent or his right to counsel.  Implicit in the state courts' decisions is the finding that Petitioner's statements were made voluntarily.[47]  The factual findings on which the state courts based their decisions are fully supported by the record, and the state court decisions are neither contrary to nor an unreasonable application of clearly established federal law.  As a result, Petitioner is not entitled to federal habeas relief based on the admission of his oral and written statements.

### V.    PETITIONER WAS DENIED DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT BY THE ADMISSION OF PREJUDICIAL DNA EVIDENCE WITHOUT A PROPER PREDICATE

During the guilt/innocence phase of Petitioner's trial, the State presented expert testimony regarding DNA testing performed on blood scrapings taken from a beer bottle

---

[46]    Review of the videotape of Petitioner's polygraph examination and interrogation reflects that Petitioner's rights were explained to him clearly and at the rate of normal speech.  Petitioner was asked if he understood each right explained to him, and he either answered orally or by indicating with a nod of his head that he understood.  Hendricks asked Petitioner if he had any questions about the rights Hendricks had just explained.  Petitioner indicated no and signed the rights form.  Videotape, Tape 1 of 3, Exh. 81 to Petition.

[47]    Federal courts in habeas proceedings "are required to grant a presumption of correctness to a state court's explicit and implicit findings of fact if supported by the record."  *Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1107 (1999).

found at Petitioner's auto shop. The State's expert testified that the test which was performed on the blood scrapings was the DQ alpha typing because the sample was very small. Tr., at XXXII:890. The State presented evidence that the DQ alpha typing is far less determinative than DNA "fingerprinting," but permits a conclusion that Gracie Purnhagen was within the 5% of the relevant population not excluded by the DQ alpha typing analysis. *Id.* at XXXII:890, 903-04.

Petitioner alleges that his constitutional rights were violated by the admission of this DNA evidence without a prior hearing. Petitioner asserts that the DNA testing was unreliable and that it was presented to the jury in an incoherent manner which "mesmerized the jury." Petition, at 201.

Respondent argues that the DNA claim is procedurally barred. Alternatively, Respondent argues that Petitioner is not entitled to relief on the merits of this claim.

## A.    Procedural Bar

In this case, the state habeas court found that Petitioner "failed to object to the trial court's failure to hold a hearing on the reliability of the DNA evidence and waived any error." FFCL, at 1134, ¶ 9. Where a state court explicitly relied on a procedural bar, Petitioner may not obtain federal habeas review absent a showing of cause and actual prejudice, or a showing that a failure to consider the defaulted claims "will result in a fundamental miscarriage of justice." *See Johnson v. Puckett*, 176 F.3d 809, 816 (5th Cir. 1999) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). To bar federal habeas review, the procedural rule applied by the state court must be "firmly established and regularly followed." *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998), *cert. denied*, 119

S. Ct. 1809 (1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423 (1991)). "To establish cause for a procedural default, there 'must be something *external* to the petitioner, something that cannot fairly be attributed to him.'" *Johnson*, 176 F.3d at 816 (quoting *Coleman*, 501 U.S. at 753).

The scope of the "fundamental miscarriage of justice" exception is extremely narrow and is applied *only* where the petitioner claims to be actually innocent of the crime for which he was convicted. *Fearance v. Scott*, 56 F.3d 633, 637 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). A "manifest miscarriage of justice" also requires a showing that "a constitutional violation prevented [Petitioner] from showing his actual innocence." *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994).

The application of the contemporaneous objection bar has been firmly established and regularly followed by the Texas courts and, as a result, can procedurally bar federal habeas review. *See Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995), *cert. denied*, 518 U.S. 1022 (1996). Petitioner has not established a "manifest miscarriage of justice" through proof that "a constitutional violation prevented [him] from showing his actual innocence." Indeed, as discussed above, Petitioner's evidence falls well short of the standard necessary to support a claim of actual innocence. Federal habeas review of Petitioner's DNA claim is procedurally barred by Texas's contemporaneous objection bar.

**B.     Consideration of the DNA Claim on the Merits**

The state habeas court concluded that "the State proved the reliability of the DNA evidence during the trial and there was no due process violation." FFCL, at 1134, ¶ 9. The state habeas court found as a factual matter that the "State's DNA evidence was proved

(

reliable during trial." *Id.* at 1130, ¶ 52. Petitioner argues that the DNA testing was unreliable because the tests were not as conclusive "as they could have been if a different kind of testing [had] been performed." Petition, at 198. Petitioner also challenges the reliability of the DNA evidence because, in Petitioner's view, the State and defense counsel misunderstood the evidence and misrepresented it to the jury. The Court has reviewed the record and concludes that the state habeas court's finding and conclusion are correct.

### 1.    Reliability of Testing

The state habeas court's finding that the reliability of the DNA evidence was established at trial is fully supported by the record and by applicable legal authorities. Robert Giles, scientific director of GeneScreen, explained clearly what DNA is and how it is amplified for analysis. Tr., at XXXII:874-76, 871-72. Giles testified that the polymerase chain reaction ("PCR") method of amplifying DNA is generally accepted by molecular biologists as reliable. *Id.* at XXXII:871-72. Giles testified that GeneScreen used generally accepted DNA extraction techniques and followed the generally accepted protocol for conducting DNA testing. *Id.* at XXXII:873. Giles explained fully the DQ alpha method of typing DNA. *Id.* at XXXII:877-87. Giles clearly explained that the DQ alpha testing, unlike the more precise DNA "fingerprinting," indicates only that the DNA sample could not have come from 95% of the population and could have come from only the remaining 5% of the population. *Id.* at XXXII:889. The DQ alpha analysis was performed in this case because the size of the evidence sample was small. *Id.* at XXXII:890. On cross-examination, Giles again testified that the DQ alpha testing is reliable. *Id.* at XXXII:892.

(

The State also presented testimony from Judy Floyd, the DNA forensic analyst at GeneScreen who performed the DNA testing in this case. Floyd testified that she performed a DNA comparison between tissue samples from Gracie Purnhagen and scrapings from a bottle. *Id.* at XXXII:902-03. Floyd testified that the "bottle scrapings and the liver tissue from Grace typed the same. They had the same DQ alpha typing." *Id.* at XXXII:903. Floyd testified that this result "means that [Gracie] very well could have been a contributor of the blood on the bottle." *Id.* More precisely, Floyd testified that "[a]pproximately 95 percent of the remainder of the population is eliminated as having been contributors of that blood." *Id.* at XXXII:904.

This testimony supports the state habeas court's conclusion that the reliability of the DNA evidence was established at trial. This Court finds that both Giles and Floyd had scientific knowledge that would assist the trier of fact, that they were qualified to testify regarding their scientific opinions, that DNA testing is sufficiently valid for admissibility, that the specific DNA testing technique involved in this case is valid, and that the DNA testing technique was properly applied in this case. The Court finds that Giles and Floyd presented the DNA evidence in a clear, concise, and comprehensible manner.

Generally, evidence introduced by the State in a criminal trial is prejudicial to the defendant. The prejudicial effect of the DNA evidence, however, did not outweigh its substantial probative value. Petitioner has presented no basis for this Court to reject the state habeas court's holding regarding the reliability of the DNA evidence.[48]

---

[48]    The Court notes that it authorized funds for Petitioner to conduct independent DNA analysis
(continued...)

(

### 2.    Counsels' Alleged Misrepresentation of the DNA Evidence

The record does not support Petitioner's allegation that both the prosecutor and the defense attorney misrepresented the DNA evidence to the jury during closing argument. The prosecutor argued that the jury "[knew] that it is Gracie's blood on that beer bottle." Tr., at XXXIV:1339. As discussed more fully previously, this statement was within the realm of proper argument to the jury; the statement amounted to the contention that the jury should conclude from all the evidence presented at trial that the blood on the bottle was Gracie's. The statement does not reflect a misunderstanding or misrepresentation of the DNA evidence.

Defense counsel stated in closing argument that the blood was "95% probably Gracie's blood." *Id.* at XXXIV:1270. Again, the statement does not reflect a misunderstanding or a mischaracterization of the evidence that 95% of the population other than Gracie was excluded as a possible contributor of the blood on the bottle. This Court denies Petitioner's request for federal habeas relief based on the admission of DNA evidence.

---

[48]    (...continued)
in this federal habeas proceeding. Notwithstanding this funding, however, Petitioner has not presented evidence that the DNA results admitted at trial were incorrect.

(

## VI. PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND ARTICLE 1, SECTION 10, 13 AND 15 OF THE TEXAS CONSTITUTION WERE VIOLATED BY THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON LESSER-INCLUDED OFFENSES[49]

Petitioner alleges that he was constitutionally entitled to an instruction on the lesser-included offenses of murder, felony murder, and/or aggravated sexual assault. The state habeas court found that Petitioner did not object to the absence of a lesser-included-offense instruction. FFCL, at 1130, ¶ 58. The state habeas court further found that "there was no evidence showing that [Petitioner] was guilty of the lesser offenses of murder or rape." *Id.* at 1130, ¶ 59. This Court agrees with each of these findings.

Although the United States Supreme Court in *Beck v. Alabama*, 447 U.S. 625 (1980), prohibited a blanket ban on lesser-included-offense instructions, a "capital defendant is constitutionally entitled to instructions on a lesser-included offense only if he has demonstrated that the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Jones v. Johnson*, 171 F.3d 270, 274 (5th Cir.), *cert.*

---

[49]   A federal habeas petitioner must establish a violation of the Constitution or laws of the United States and, generally, claims that the state court "improperly applied state law do not constitute an independent basis for federal habeas relief." *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir.), *cert. denied*, 118 S. Ct. 2364 (1998). "The Supreme Court has held that, when a state guarantees a structural protection, it violates the Due Process Clause of the federal Constitution if it fails meaningfully to vindicate that guarantee." *Hoover v. Johnson*, 193 F.3d 366, 370 (5th Cir. 1999). Because the lesser-included-offense issue requires consideration of Texas law, and assuming "*arguendo* only, that this principle applies outside the context of *Evitts* [*v. Lucey*, 469 U.S. 387 (1985)] and related cases" the Court considers Petitioner's claim regarding an alleged violation of the Texas Constitution together with his due process claim.

(

*denied*, 120 S. Ct. 29 (1999). Under Texas law,[50] there must be evidence in the record relating to the lesser-included offense for the jury to consider before a lesser-included-offense instruction is warranted. "It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense." *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997), *cert. denied*, 523 U.S. 1079 (1998).

Petitioner argues that he was entitled to the lesser-included-offense instructions because "there was evidence introduced that would allow a rational jury to acquit him of the capital murder and convict him of the lesser included offense of murder because the state did not meet this high burden of proving that he committed the murder intentionally." Petition, at 207. A similar argument was presented and rejected by the petitioner in *Jones*. In that case, the Fifth Circuit noted that the evidence of record did not support the petitioner's argument. *See Jones*, 171 F.3d at 275. As was true in the *Jones* case, the "brutal, drawn-out nature of the murder [in this case] is also evidence of the intentional nature of this crime." *See id.* The evidence presented at trial established that Gracie Purnhagen's throat was slashed, severing the carotid artery. *See* Tr., at XXVIII:254.

Additionally, as was true in the *Jones* case, in this case the "jury had the opportunity to distinguish between knowing and intentional conduct during the sentencing." *See Jones*, at 275. "Any suggestion that the jury rationally could have found [Petitioner] guilty of

---

[50]   "In deciding whether a jury could rationally acquit on the capital crime and convict for the noncapital crime, we must turn to Texas law." *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995).

(

killing knowingly but not intentionally is foreclosed by the affirmative response to the greater mental element during the sentencing phase." *Id.*

Petitioner also argues that he was entitled to the lesser-included-offense instruction because the jury could have found that he "committed the penetration with the bottle on Gracie Purnhagen's corpse." Petition, at 214. Petitioner asserts that there is "no proof . . . that [Gracie] was sexually assaulted with an object *before* she was killed . . .." Response, at 49. Petitioner's assertion is clearly refuted by the record. The Harris County Medical Examiner testified unequivocally that Gracie Purnhagen was alive at the time she was sodomized with a bottle. *See* Tr., at XXVIII:247, 254. The record contains no evidence to the contrary.

While the jury could have acquitted Petitioner because they disbelieved the testimony of Delton and all of the physical evidence incriminating Petitioner, the record does not contain evidence from which the jury rationally could have found Petitioner not guilty of capital murder, but guilty of murder, felony murder, or aggravated sexual assault. As a result, Petitioner was not constitutionally entitled to a lesser-included-offense instruction. The Court denies federal habeas relief based on Petitioner's sixth claim.

## VII.   PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE INTRODUCTION OF HIGHLY PREJUDICIAL PHOTOGRAPHS DURING THE GUILT-INNOCENCE PHASE OF HIS TRIAL

Petitioner alleges that his constitutional rights were violated by the introduction of photographs during the guilt/innocence phase of his trial. Petitioner does not allege that the photographs were inaccurate or misleading, only that they were gruesome, inflammatory, and

(

extremely prejudicial.  The state habeas court concluded that there was "no due process violation in the admission of the photographs." FFCL, at 1134, ¶ 11.

Petitioner alleges that the photographs "had no probative value whatsoever in the presentation of the State's case.  There was no dispute as to the identity of the victim or the method and location of the killing." Petition, at 218.  Contrary to Petitioner's allegation, the photographs had significant probative value.  For example, the medical examiner testified outside the presence of the jury that several of the photographs were needed to explain his testimony and to show his findings to the jury.  Tr., at XXVIII:227-29.  The medical examiner testified on cross-examination, still outside the presence of the jury, that the previously-admitted photographs did not show the injuries as clearly for purposes of his testimony.  *Id.* at XXVIII:231.

Other challenged photographs were used during a witness's testimony to show the location of the bodies in relation to each other and their positions at the time they were found.  These photographs are clearly relevant and the purposes for which they were introduced were legitimate.  *See Woods v. Johnson*, 75 F.3d 1017, 1039 (5th Cir.), *cert. denied*, 519 U.S. 854 (1996) ("illustrat[ing] and mak[ing] more understandable the officers' testimony which described the [crime scene] and its condition, and the location and condition of the deceased's body and the nature and extent of the injuries to the deceased" were "certainly legitimate purposes").

A criminal defendant's due process rights are not violated by the introduction of evidence on a material issue, even if the issue is not in dispute.  *See United States v. Hall*, 152 F.3d 381, 401 (5th Cir. 1998) (reviewing introduction of photographs of murder victim

(

under Federal Rules of Evidence 401 and 403), *cert. denied*, 119 S. Ct. 1767 (1999). "The reason that a criminal defendant cannot typically avoid the introduction of other evidence of a particular element of the offense by stipulation is that the government must be given the opportunity 'to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight.'" *Id.* (quoting *Old Chief v. United States*, 519 U.S. 172 (1997)).

Petitioner argues that "there were plenty of other photos that could have been used which were less inflammatory." Petition, at 219. Although the photographs in this case were particularly gruesome because the murder was particularly gruesome, the United States Constitution does not require the prosecution to use the least inflammatory photographs available. Indeed, truly relevant photographs are admissible regardless of their inflammatory nature. *See Woods*, 75 F.3d at 1038-39.

The state habeas court's decision is neither contrary to, nor does it involve an unreasonable application of, clearly established Federal law as established by the United States Supreme Court. The Court denies Petitioner's request for federal habeas relief based on the introduction of the challenged photographs during the guilt/innocence phase of his trial.

## VIII. PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE USE OF HIGHLY PREJUDICIAL PHOTOGRAPHS AT THE PUNISHMENT PHASE OF HIS TRIAL

Petitioner similarly alleges that his constitutional rights were violated by the use of the gruesome photographs "as victim impact evidence" during the punishment phase.

Petition, at 221. As noted in the prior section, the state habeas court concluded that there was "no due process violation in the admission of the photographs." FFCL, at 1134, ¶ 11.

During the punishment phase of his trial, Petitioner presented testimony from Janet Cox, a longtime family friend of Petitioner and his family. Ms. Cox testified regarding Petitioner's emotionally disturbed mother who committed suicide. Tr., at XXXVI:113-14. Ms. Cox also testified that Petitioner was raised in a "very dysfunctional home." *Id.* at XXXVI:114. Ms. Cox described Petitioner as "a very kind, sensitive, compassionate friend." *Id.* at XXXVI:122.

On cross-examination, the prosecutor challenged Ms. Cox's description of Petitioner and, after telling the witness that the jury had seen the pictures of Gracie Purnhagen, asked Ms. Cox if she would like to see the pictures and perhaps they would change her opinion. *Id.* at XXXVI:129-30. Ms. Cox responded, "If you would like to show them to me." *Id.* at XXXVI:130. The prosecutor handed the photographs to Ms. Cox, who then stated that "this is the sickest thing that I have ever seen in my life and anyone that can do this is a very ill person." *Id.* at XXXVI:131. The transcript does not indicate that the photographs were shown to the jury at this point, only that they were shown to Ms. Cox.

A similar claim asserting that a photograph used during the sentencing phase constituted prejudicial victim impact evidence was rejected by the Fifth Circuit in *Cordova v. Collins*, 953 F.2d 167, 174 (5th Cir.), *cert. denied*, 502 U.S. 1067 (1992). In *Cordova*, the Fifth Circuit affirmed the district court's holding that the photograph did not "rise to the level

(

of 'victim impact evidence' condemned in *Payne v. Tennessee*."[51]  *Id.* (citation omitted).

Similarly, this Court concludes that the use of the photographs during the cross-examination

of Ms. Cox did not constitute victim impact evidence.  Even if the use of the photographs

were construed as victim impact evidence, it was not so prejudicial that it infected the trial

with unfairness and resulted in a violation of Petitioner's constitutional rights.

Petitioner is not entitled to federal habeas relief based on the use of the challenged

photographs during Ms. Cox's cross-examination.

## IX.   PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE INTRODUCTION OF VICTIM IMPACT STATEMENTS DURING THE GUILT-INNOCENCE PHASE OF HIS TRIAL

Petitioner's next claim for relief is that his constitutional rights were violated by the

introduction of victim impact statements during the testimony of Linda Purnhagen, Gracie's

mother.  Specifically, Petitioner challenges the following questions and answers:

> Q.   Would you please describe for the jury a little bit about what kind of person Gracie was?
>
> A.   She was a very loving girl.  She was very fun-loving.  She loved life. A very bubbly personality.
>
> Q.   What about Tiffany?  Describe her.
>
> A.   Tiffany was a sweet girl.  She wanted to do everything for anybody, always trying to help people.
>
> Q.   How about Gracie and Tiffany, how did they get along?

---

[51]   The following section, addressing Petitioner's primary victim impact claim, provides a more detailed discussion of the legal authorities involving victim impact evidence.

(

A.     Well, typical sisters.  Gracie was protective, but yet sometimes she thought Tiffany was a pain.

Q.     Did Gracie have to babysit Tiffany a lot?

A.     Yes, she did.

Q.     Why was that?

A.     I worked.  My husband worked.  We both worked long hours.

Q.     So that left Gracie to tend to Tiffany?

A.     Right.

Petition, at 224 (quoting Tr., at XXVI:28-29).

The state habeas court found that "by failing to object to Linda Purnhagen's testimony at trial, [Petitioner] waived his claim in Ground for Relief [Seven][52] that Ms. Purnhagen's testimony included victim impact statements."  FFCL, at 1134, ¶ 6.  Respondent argues correctly that Petitioner's claim regarding alleged victim impact evidence is procedurally barred by the state court's implicit application of the contemporaneous objection bar.  As with prior claims which were procedurally barred, however, the Court will address the merits of Petitioner's claim in the interests of both justice and a complete record.

Victim impact statements are no longer *per se* impermissible.  *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991).  "The *Payne* Court recognized that only where such evidence or argument is unfairly prejudicial may a court prevent its use through the Due Process Clause of the Fourteenth Amendment." *Castillo v. Johnson*, 141 F.3d 218, 224 (5th

---

[52]     As noted by the Texas Court of Criminal Appeals in its Order reviewing the state habeas court's findings and conclusions, the relevant conclusion of law "should refer to ground for relief seven (7), rather than ground for relief four (4)."

(

Cir.), *cert. denied*, 119 S. Ct. 28 (1998) (extending *Payne* to use of victim impact evidence during guilt-innocence phase).

The state habeas court found that Petitioner had not shown that "Mrs. Purnhagen made victim impact statements at guilt-innocence." FFCL, at 1128, ¶ 30. The state habeas court further found that "Mrs. Purnhagen's testimony was relevant to the offense." *Id.* at 1130, ¶ 49. These mixed questions of law and fact are subject to the "unreasonable application" clause of the AEDPA's standard of review, and federal habeas relief is permissible only if the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Nobles*, 127 F.3d at 416.

The factual circumstances of the offense included evidence that Gracie and Tiffany were staying together while the rest of the family went to the speedway. Tr., at XXVI:27. Evidence that Gracie frequently was "left . . . to tend to Tiffany" was relevant to explain this situation. Evidence that Tiffany wanted to do things for other people and that Gracie was protective of Tiffany was similarly relevant to the circumstances in which the two girls found themselves on the evening on June 13, 1990. Mrs. Purnhagen did not state any opinions about the impact of her daughters' deaths on herself or the other family members. She provided only brief descriptions of the girls' personalities. The state habeas court's conclusion that the challenged evidence was not victim impact evidence is supported by the record.

Additionally, this Court concludes that the evidence, if construed as victim impact evidence, falls well short of evidence which is so prejudicial that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See, e.g., Darden*

(

*v. Wainwright*, 477 U.S. 168, 181 (1986).  The brief description of Gracie and Tiffany, and of their relationship with each other, "did not inflame the jury's passions more than did the facts of the crime."  *See Payne*, 501 U.S. at 832 (concurring opinion of Justice O'Connor).

The challenged evidence did not violate Petitioner's due process rights, and he is not entitled to federal habeas relief based on Mrs. Purnhagen's testimony.

## X.   TEXAS'S CAPITAL SENTENCING SCHEME VIOLATES THE DUE PROCESS CLAUSE AND THE EIGHTH AMENDMENT BY BANNING EVIDENCE THAT A "LIFE" SENTENCE MANDATES A LONG AND DEFINITE TERM OF YEARS BEFORE PAROLE ELIGIBILITY

Petitioner's final claim is that his due process and Eighth Amendment rights were violated by the trial court's failure to inform the jury that a "life" sentence requires most convicted capital murderers to remain in prison for a lengthy period of time.[53]  In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the United States Supreme Court held that due process requires that a sentencing jury in a capital murder prosecution be informed if the defendant would be statutorily ineligible for parole if the jury imposed a life sentence.  *Id.* at 169.  *Simmons* does not provide a basis for the relief Petitioner seeks.[54]

---

[53]   Petitioner concedes in his Amended Petition that he would have been eligible for parole after serving only 15 years.  *See* Amended Petition, at 236 n.36.

[54]   In the Amended Petition, counsel for Petitioner relies on what counsel mischaracterizes as "the Supreme Court's clear warning in *Brown v. Texas*, 118 S. Ct. 355 (1997)."  Amended Petition, at 229.  The cited authority, however, is Justice Stevens's opinion regarding the denial of certiorari in the *Brown* case, in which Justices Souter, Ginsburg, and Breyer joined.  Justice Stevens specifically characterized his comments as "not [a] comment on the merits of petitioner's constitutional claims" but as a reminder that a denial of certiorari is not a decision on the merits.  *Brown*, 522 U.S. 940 (1997).  Justice Stevens's comments in *Brown* do not provide clear Supreme Court authority supporting Petitioner's argument.

(

The Fifth Circuit has held repeatedly that the due process clause as applied in *Simmons* requires "the state to inform a sentencing jury about a defendant's parole ineligibility when, *and only when,* (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole." *Allridge v. Scott,* 41 F.3d 213, 222 (5th Cir. 1994) (emphasis in original), *cert. denied,* 514 U.S. 1108 (1995); *see also Boyd v. Johnson,* 167 F.3d 907, 912-13 (5th Cir.), *cert. denied,* 120 S. Ct. 20 (1999); *Green v. Johnson,* 160 F.3d 1029, 1044-45 (5th Cir. 1998), *cert. denied,* 119 S. Ct. 1107 (1999); *Muniz v. Johnson,* 132 F.3d 214, 224 (5th Cir.), *cert. denied,* 523 U.S. 1113 (1998). The Fifth Circuit has also rejected *Simmons* claims based on the Eighth Amendment. *See Miller v. Johnson,* __ F.3d __, 2000 WL 4950 *16-17 (5th Cir. Jan. 5, 2000); *Green,* 160 F.3d at 1045.

The Fifth Circuit has steadfastly declined to extend *Simmons* beyond those situations in which the capital murder defendant is statutorily ineligible for parole, and this Court is bound by the Fifth Circuit's decisions. Because Petitioner was not statutorily ineligible for parole if sentenced to life in prison, his due process and Eighth Amendment rights were not violated by the trial court's failure to inform the jury that a life sentence usually results in the defendant remaining in custody either for the rest of his life or for a long and definite period of time.[55] The Court denies Petitioner's final claim for relief.

---

[55]     This claim is also procedurally barred. The habeas court found that Petitioner "did not object to the absence of a parole instruction." FFCL, at 1130, ¶ 56. As discussed above, the state court's application of a procedural bar precludes federal habeas relief.

## CONCLUSION AND ORDER

"Though the penalty is great and our responsibility heavy, our duty is clear." *Rosenberg v. United States*, 346 U.S. 273, 296 (1953) (Clark, J.). Based on the foregoing, the Court concludes that Petitioner is not entitled to federal habeas relief. As a result, it is hereby

ORDERED that Respondent's Motion and Amended Motion for Summary Judgment [Doc. # 47 and # 50] are **GRANTED**. It is further

**ORDERED** that Dennis Thurl Dowthitt's Petition for Writ of Habeas Corpus is **DENIED** and this case is **DISMISSED WITH PREJUDICE**. Petitioner's request to hold the Petition in abeyance awaiting the Supreme Court decision in *Williams v. Taylor* [Doc. # 55-1] and for an evidentiary hearing beyond that held on January 7, 2000 [Doc. # 55-2] are **DENIED**.

The Court will issue a separate final judgment.

SIGNED this *27th* day of January, 2000, at Houston, Texas.

NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE